**Phillip Lee HEAD, Appellant**

v.

**The STATE of Texas, Appellee.**

**Nos. 14–07–00855–CR, 14–07–00856–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 30, 2009.

Discretionary Review Refused
March 3, 2010.

Robert A. Scardino, Jr., Houston, TX, for Appellants.

B. Warren Goodson, Jr., Galveston, TX, for State.

Panel consists of Justices FROST, BROWN, and BOYCE.

## OPINION

WILLIAM J. BOYCE, Justice.

A jury convicted appellant Phillip Lee Head of misapplication of fiduciary property and assessed punishment at 25 years' confinement and a $10,000 fine. The jury also convicted appellant of securities fraud and assessed punishment at 32 years' confinement and a $10,000 fine. Appellant appeals his conviction for misapplication of fiduciary property in cause number 14–07–00855–CR and his conviction for securities fraud in cause number 14–07–00856–CR on numerous grounds. We affirm.

## Background

### A. Appellant Operates Capital Estate Services and Guardian Group

Appellant sold annuities and trusts to senior citizens through his Galveston-

based estate planning company, Capital Estate Services ("Capital"). Appellant operated Capital in the front of his office; the back housed Guardian Group, a telemarketing operation. Guardian Group telemarketers contacted senior citizens who responded to informational cards mailed by appellant. Guardian Group telemarketers set up appointments for Capital employees to visit seniors at their homes. These employees provided investment and estate planning information to the seniors and attempted to sell trusts and annuities.

Appellant also generated business for Capital by advertising in newspapers. The advertisements promoted seminars sponsored by appellant—a "certified estate planner, certified senior advisor, [and] certified wealth transfer practitioner" with a "masters certification in estate planning"— and his team of professionals. Appellant conducted his seminars at hotels and restaurants; the seminars targeted seniors and included a complimentary lunch or dinner.

Appellant presented himself at these seminars as an expert discussing the benefits of avoiding probate through irrevocable trusts, and the funding of such trusts through annuities. Appellant's employees contacted seniors who attended the seminars and scheduled home visits with the goal of selling trusts and annuities to the seniors. After a senior agreed to establish a trust, the trust documents were created in appellant's office using a format that was set up on the office computer and then reviewed by an attorney. Appellant's employees delivered the trust documents to the seniors.

**B. Appellant Joins Wintford Verkin to Create Retriever Equity Fund**

Appellant hired attorney Wintford Evans Verkin, Jr.,[1] in 2000, to provide legal services and assist appellant in creating trusts for his clients.

Verkin accompanied appellant to Austin in 2000 or 2001, to gather information about two companies—Old South Trust and Collins Financial. Appellant had been selling Old South Trust stock to his Capital clients before he teamed up with Verkin.

Old South Trust and Collins Financial were engaged in a joint venture under which Old South Trust raised investment money by selling stock, and Collins Financial used the money to buy distressed assets such as bulk credit card debt and delinquent education loans. Appellant and Verkin visited Collins Financial at its Austin headquarters to learn how the company operated. After the first trip with appellant, Verkin continued investigating Collins Financial and Old South Trust. By then, appellant and Verkin had decided to set up a business modeled after Old South Trust.

Verkin traveled to Murphysboro, Tennessee, and met with the CEO of Old South Trust and each of its division heads to learn about its organization and operation, and its agreements with Collins Financial. Based on this information, appellant and Verkin decided to form Retriever Equity Fund, Incorporated ("Retriever"). They contemplated that Verkin would organize Retriever and manage it. Appellant would receive 50 percent of Retriever's profits through a service agreement between Retriever and an entity called RPH—another company owned by appellant.

Appellant's role was to raise money for Retriever and bring in investors through

1. Verkin is variously identified in the appellate record as William Verkin, Winford Evans Verkin, Jr., W.E. Verkin, Jr., and Wintford Evans Verkin, Jr. Based on the signature on his plea agreement, we conclude that his correct name is Wintford Evans Verkin, Jr.

his successful business at Capital. Appellant and his employees—in particular, Rita Brychta and John Drake—induced appellant's Capital clients to switch their investments from Old South Trust to Retriever. According to Retriever's private placement memorandum, which was modeled after Old South Trust's private placement memorandum, money from investors who contributed to Retriever would be invested in distressed assets.

Verkin's role was to manage Retriever's day-to-day operations and keep records for the investors in return for a $150,000 annual salary. Verkin selected most of Retriever's investments. He wrote all of the checks on behalf of Retriever and made deposits. Appellant had no access to the two bank accounts Verkin handled for Retriever. According to Verkin, appellant and Verkin both knew how Retriever operated and what Retriever was doing. Verkin and appellant talked about Retriever four to five times a day.

Retriever's original articles of incorporation were filed on December 31, 2001. Appellant instructed his employees to contact Capital clients who previously had bought trusts, annuities, or Old South Trust stock and tell them about Retriever.

Within weeks of Retriever's incorporation, Verkin realized that Retriever was undercapitalized and needed tens of millions of dollars to be economically feasible. In January or February 2002, Verkin told appellant that Retriever needed millions more in capital. Verkin told appellant that Retriever would not invest in distressed assets, and asked appellant to start looking at other investment opportunities. Verkin also told appellant that he would explore investing in litigation. Appellant told Verkin that he would increase the frequency of his seminar presentations to attract more investors. Appellant and Verkin never discussed informing potential investors that, in fact, Retriever would not be investing in distressed assets as represented in the private placement memorandum.

Appellant received no payment under the service agreement between Retriever and RPH. However, appellant received multiple loans from Retriever between 2002 and 2003 totaling more than $700,000—paid to appellant individually or to his companies—under a loan participation agreement. Appellant also was paid a 10 percent commission on the money Capital clients invested in Retriever; his commissions totaled nearly $370,000 between January 2002 and April 2004.

Retriever never invested in distressed assets as originally contemplated. Instead, Retriever invested in personal injury litigation pursued by Verkin's law firm and another law firm. Retriever also funded a litigation matter referred to as "Medallion" in the Bahamas; other Retriever investments included a loan participation agreement with RPH for several hundred thousand dollars, real property in Galveston County, certificates of deposit, promissory notes, and a judgment.

Numerous seniors cashed in their savings, retirement funds, or annuities to invest in Retriever. Several investors incurred substantial surrender penalties after cashing in their annuities and other investments, but were told that the losses would be offset by a bonus from Retriever. Seniors invested more than $3.7 million in Retriever between 2001 and 2004. By 2005, Retriever's assets were worth $450,000. Retriever was in receivership by the time of appellant's trial.

The evidence at trial showed that Brychta, one of appellant's Capital employees, started selling Retriever stock to several seniors in 2002. Brychta learned about Retriever from appellant, who told her that it was fashioned after Old South

Trust. Appellant also told Brychta that appellant and Verkin talked about Retriever being "a good plan" for Capital clients and "something they could make a good income off of." Brychta talked to Verkin about Retriever so she could inform clients about where their funds would be invested. Verkin explained to Brychta that Retriever would invest in credit card debt and distressed real estate properties which then would be "rehabbed" and sold.

Appellant instructed Brychta to visit Capital clients and induce them to invest in Retriever. As instructed by appellant and Verkin, Brychta told clients that Retriever invested in credit card debt and foreclosed homes. Brychta did not know—and never told clients—that Verkin and appellant were borrowing money from Retriever; that Verkin had filed for bankruptcy in 1994; or that Retriever had used previous investors' funds for purposes other than buying distressed assets.

Brychta and appellant discussed how Retriever would make up any losses clients incurred from annuity surrender charges, and appellant explained that Retriever would issue a bonus in the form of additional Retriever shares. Accordingly, investors who incurred a withdrawal penalty were told that Retriever would offset for the penalty.

By 2004, Brychta knew that appellant had gone into bankruptcy in May 2003, but she did not tell clients about the bankruptcy. She failed to disclose that a cease and desist order had been entered by the Texas State Securities Board against her and appellant. Brychta also failed to disclose that a consent judgment was entered against appellant, RPH, and Guardian Group in Iowa pursuant to the Iowa Consumer Fraud Act. This judgment enjoined appellant and his named companies from soliciting in "Iowa or directing toward Iowa consumers transactions involving timeshares."

Several of the seniors who lost the money they invested in Retriever also testified at trial. Donald Long, Mabel Milsted Silverstein, Wallace Thornton, Anna Weber, and Harvey Birdwell confirmed that they had been Capital clients and had invested in Retriever after talking to Brychta or Drake, another Capital employee. These investors were told that Retriever would invest in distressed assets. They testified that they did not know Retriever invested in litigation and made loans to appellant and Verkin. They also testified that they would not have invested in Retriever had they known Retriever would not buy distressed assets; that Retriever would make loans to appellant and Verkin; or that Verkin had filed for bankruptcy.

Jennifer Sedwick, a financial analyst for the Texas State Securities Board, also testified at trial. She investigated Retriever, appellant, and Verkin. She reviewed Retriever's bank records and financial documents for the time period from January 1, 2002 to November 30, 2005. Sedwick concluded that 41 percent of Retriever's funds went to Verkin, his companies or his family; 15 percent went to some of the investors in monthly or quarterly dividends; 9 percent went to the law firm of Bryant and Bouman in loans; 2 percent went to Verkin for personal expenses; 6 percent went to people Sedwick was unable to identify; and 19 percent went to appellant personally or to his companies.

## C. Appellant Establishes Trusts for Gladys Theall

In addition to his other activities, appellant also handled all of 87–year–old Gladys Theall's investments after her husband died. Appellant set up two identical trusts for Theall in July 1999—the JET and GPT trusts. These two trusts were set up for the benefit of their certificate holders.

Theall was the sole trust certificate holder and investor for both trusts.

Marianne Clark and Russell Peterson were appointed as original trustees of JET, and Marianne Clark and Norman Weiler were appointed as original trustees of GPT. There was evidence at trial that appellant was designated as the "trust protector" of the two trusts and that he had authority to appoint trustees of these trusts.

Appellant fired the original trustees and appointed Verkin as trustee of the trusts in March 2001. Verkin liquidated the trusts' annuities and invested the money in Retriever. After the trusts' annuities had been liquidated and the money invested in Retriever, appellant and Verkin visited Theall at her nursing home. They persuaded her to approve the investment of the trusts' money in Retriever and waive "any conflict of interest issues" arising from Verkin's ownership interest in Retriever.

Theall understood that Retriever would give her a yearly dividend check at 13 percent interest, but she did not know how Retriever was investing the money. Theall did not know that appellant and Verkin previously had declared bankruptcy; she received this information only after her "money had disappeared." Theall also did not know that a judgment had been entered in Iowa against appellant arising from a lawsuit involving time shares; that appellant and Verkin would receive loans out of her investment in Retriever; or that Retriever loaned money to fund litigation.

Theall's niece, Maryann Broussard, took care of Theall's monthly bills and medical needs. She spoke with Verkin by telephone in March or April 2001. After Verkin became trustee, Broussard stopped receiving statements on the annuities. When she questioned what had happened to the money invested in the annuities, Verkin responded that he could not discuss Theall's affairs with Broussard. Broussard hired attorney Michael Guarino to find out what happened to the trusts' annuities. She was informed that the trusts incurred substantial surrender penalties for cashing in the annuities, and that $2.3 million from these annuities had been invested in Retriever.

## D. Appellant is Indicted, Tried, and Convicted of Securities Fraud and Misapplication of Fiduciary Property

The State indicted appellant for securities fraud, alleging in pertinent part that appellant engaged in fraud in connection with the sale and offer for sale of Retriever stock to 22 specifically named investors. The indictment alleged that appellant knowingly and intentionally

- misrepresented that funds invested to purchase Retriever stock would be used to acquire distressed asset portfolios;

- failed to disclose that Verkin, the president and the chief operating officer of Retriever, filed for Chapter 7 bankruptcy on or about October 19, 1994;

- failed to disclose that funds paid by previous Retriever shareholders to purchase distressed asset portfolios were used for other purposes;

- failed to disclose that investor funds paid to purchase Retriever shares would be used to make a loan to appellant or a corporation in which appellant had an interest;

- failed to disclose that the Attorney General of Iowa sued appellant on or about June 11, 2002, alleging that appellant violated the Consumer Fraud Act; and that on or about July 4, 2003, appellant signed a consent judgment enjoining him from soliciting consumers to pay him money in connection with the mar-

keting, sale, or any other transfer of a time share;

- failed to disclose appellant filed for Chapter 11 bankruptcy on or about May 19, 2003;
- failed to disclose that the Texas Securities Commission issued an agreed cease and desist order against appellant on or about January 21, 2004, finding that he violated the registration requirement for the Texas Securities Act in connection with his offer for sale and sale of certificates of deposit.

The State also indicted appellant for misapplication of fiduciary property. The indictment alleged that appellant intentionally, knowingly, and recklessly misapplied $200,000 or more, which he held as a fiduciary, contrary to the agreements under which he held the property. The indictment further alleged that such misapplication involved substantial risk of loss to Gladys Theall, an elderly individual and the owner of the trust property. The indictment further alleged that appellant misapplied the property for his own benefit; failed to preserve the property by incurring unreasonable penalties for surrendering assets; misrepresented the types of investments made; failed to disclose his personal interest in and other material facts related to the investment at the time the investments were made; failed to give a proper accounting and paid himself and/or others excessive and unreasonable commissions and fees; invested in the property in a manner that was not prudent or reasonable; failed to act in good faith; failed to deal fairly with Theall; and/or failed to fully restore the property to Theall upon demand.

After hearing the witnesses' testimony and viewing all the evidence presented, the jury was instructed that it could find appellant guilty if it determined he acted alone, or alternatively, if he acted as a party with Verkin. The jury convicted appellant of securities fraud, and assessed punishment at 32 years' confinement and a $10,000 fine. The jury also convicted appellant of misapplication of fiduciary property and assessed punishment at 25 years' confinement and a $10,000 fine.

## Analysis

### A. Legal and Factual Sufficiency

 In reviewing legal sufficiency of the evidence, an appellate court will examine the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Salinas v. State,* 163 S.W.3d 734, 737 (Tex.Crim.App.2005). The court does not sit as a thirteenth juror and may not re-evaluate the weight and credibility of the record evidence or substitute its judgment for that of the fact finder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999).

 Reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. *See Mosley v. State,* 983 S.W.2d 249, 254 (Tex.Crim.App.1998) (en banc). The appellate court's duty is not to re-weigh the evidence, but to serve as a final due process safeguard ensuring only the rationality of the fact finder. *See Williams v. State,* 937 S.W.2d 479, 483 (Tex.Crim.App.1996).

 When conducting a factual sufficiency review, an appellate court must determine (1) whether the evidence introduced to support the verdict is "so weak" that the fact finder's verdict seems "clearly wrong and manifestly unjust," and (2) whether, considering conflicting evidence, the fact finder's verdict is nevertheless against the great weight and preponder-

ance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006). We view the evidence in a neutral light in a factual sufficiency review. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000) (en banc).

■■ In order to declare that an evidentiary conflict justifies a new trial, an appellate court must rely on some objective basis in the record demonstrating that the great weight and preponderance of the evidence contradicts the jury's verdict. *See Lancon v. State*, 253 S.W.3d 699, 706–07 (Tex.Crim.App.2008). An appellate court should not intrude upon the fact finder's role as the sole judge of the weight and credibility of witness testimony. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex.Crim.App.2002).

■ The jury may choose to believe or disbelieve any portion of the testimony. *See Lancon*, 253 S.W.3d at 707. Due deference must be given to the fact finder's determinations concerning the weight and credibility of the evidence, and reversal of those determinations is appropriate only to prevent the occurrence of a manifest injustice. *Martinez v. State*, 129 S.W.3d 101, 106 (Tex.Crim.App.2004).

### 1. Securities Fraud

In his third issue, appellant argues that the evidence is legally and factually insufficient to support his conviction for securities fraud.

■ The Texas Securities Act was enacted to regulate the sale of securities and to protect the public from fraud by persons engaged in selling securities. *See Shields v. State*, 27 S.W.3d 267, 273 (Tex. App.-Austin 2000, no pet.). Article 581–29(C)(1) prohibits the use of fraud or fraudulent practices in connection with the sale or offer for sale of securities. Tex. Rev.Civ. Stat. Ann. art. 581–29(C)(1) (Vernon Supp. 2008). The term "security" or "securities" includes stock. *Id.* art. 581–4(A) (Vernon Supp. 2008). The terms "sale" and "offer for sale" include every disposition or attempt to dispose of a security for value. *Id.* art. 581–4(E) (Vernon Supp. 2008). The term "sale" also includes agreements whereby securities are sold for money, or any transfer in trust or otherwise. *Id.* The term "sell" means any act by which a sale is made, and the term "sale" or "offer of sale" includes a solicitation of sale, an attempt to sell, or an offer to sell, directly or indirectly by an agent or salesman. *See id.*

■ The term "fraud" or "fraudulent practice" means any intentional failure to disclose a material fact and any misrepresentations, in any manner, of a material fact. *See id.* art. 581–4(F) (Vernon Supp. 2008). A fact is " 'material' if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest." *See Bridwell v. State*, 804 S.W.2d 900, 904 (Tex.Crim.App. 1991).

The jury also was instructed on the law of parties. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (Vernon 2003).

Appellant contends on appeal that the evidence is legally and factually insuffi-

cient to support his securities fraud conviction because it does not establish that he failed to inform investors that (1) Retriever was using their funds for investments other than distressed assets; (2) prior investor funds were used for investments other than distressed assets; (3) Verkin had filed for bankruptcy; (4) a cease and desist order had been issued by the Securities Commissioner of Texas; (5) a lawsuit had been filed by the Iowa Attorney General alleging appellant violated the Consumer Fraud Act; (6) appellant had filed for personal bankruptcy; and (7) appellant received loans from Retriever.

 Because seven alternative means of committing securities fraud were submitted to the jury in the disjunctive, proof of any one alternative means is sufficient for conviction. *Martinez v. State,* 129 S.W.3d at 106; *Brooks v. State,* 990 S.W.2d 278, 283 (Tex.Crim.App.1999); *see also Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App.1991); *Hawkins v. State,* 656 S.W.2d 70, 73 (Tex.Crim.App.1983). Additionally, because the jury returned a general verdict finding appellant guilty of securities fraud, we may uphold the verdict if the evidence is sufficient to prove appellant committed the offense either as a primary actor or as a party. *Rabbani v. State,* 847 S.W.2d 555, 558 (Tex.Crim.App. 1992); *see also Brooks,* 990 S.W.2d at 283.

 We conclude that the evidence in this case supports a finding that appellant failed to inform investors that Retriever was using their funds for investments other than in distressed assets. Retriever's private placement memorandum stated that Retriever would invest in distressed assets. Verkin testified that he realized within weeks of Retriever's incorporation that it was undercapitalized and needed tens of millions of dollars. In January or February 2002, Verkin told appellant that Retriever would need millions more to buy enough distressed assets to be profitable.[2]

Verkin told appellant that Retriever would not be investing in distressed assets and to start looking at other investment opportunities. Retriever's asset portfolio introduced at trial showed that Retriever never invested in distressed assets. Rather, Retriever's portfolio showed investments in personal injury litigation pursued either by Verkin's law firm or another law firm. Retriever also funded a litigation matter referred to as "Medallion" in the Bahamas; entered into a loan participation agreement with RPH for several hundred thousand dollars; and owned real property in Galveston County, certificates of deposit, promissory notes, and a judgment. Verkin also testified that, although he selected most of Retriever's investments, appellant and Verkin both knew how Retriever operated and what Retriever was doing.

The evidence also showed that appellant's company RPH had a service agreement with Retriever. Under the agreement, Retriever agreed to retain RPH "to evaluate, collect, manage, and liquidate distressed assets in conjunction with Retriever." RPH would receive 50 percent "of all profits [Retriever] realized in the liquidation of the distressed assets." According to Verkin, Retriever and RPH were partners and that fact was disclosed in Retriever's private placement memorandum. Verkin explained that the memorandum's business purpose section disclosed that RPH has "the full authority to go out and find distressed assets even on their own. That they can go about the business

---

**2.** Appellant does not complain on appeal that the State failed to meet its burden to adequately corroborate accomplice-witness testimony. *See* Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

of collecting and acquiring and checking those assets."

Although appellant was not paid anything under the service agreement, appellant was paid a 10 percent commission on the money investors invested in Retriever. Appellant was paid approximately $367,000 in commissions on investments clients made in Retriever.

Capital employee Brychta testified that she learned about Retriever from appellant. Generally, appellant instructed Brychta to visit Capital clients and induce them to invest in Retriever. Brychta's first sale of Retriever stock was to senior Mabel Milsted Silverstein, a client who previously established a trust through Capital. After Silverstein's husband died in 2002, she sold her house for $150,000 and appellant instructed Brychta to visit Silverstein and induce her to invest the house sale proceeds in Retriever. As instructed by appellant and Verkin, Brychta told Silverstein that Retriever invested in credit card debt and foreclosed homes. Brychta never told Silverstein, or any of her other clients, that Verkin and appellant were borrowing money from Retriever, or that Verkin had filed for bankruptcy in 1994.

Silverstein testified that she met Brychta through Capital after attending appellant's seminar with her husband. After Silverstein's husband died, she sold her home for $150,000. She invested the sale proceeds in Retriever in January 2002, after Brychta and Verkin visited her home and encouraged her to invest. Silverstein never saw Retriever's private placement memorandum, nor did Verkin or Brychta ask her to read anything before she signed documents and invested in Retriever. Silverstein testified that she felt vulnerable after her husband's death, and that she trusted Brychta and Verkin. Silverstein understood that the money she invested in

Retriever would be used to buy credit card debt; she would not have invested in Retriever had she known it made loans to appellant and Verkin.

Appellant also sent Brychta to visit 72-year-old Harvey Birdwell, another senior who had established a trust through Capital, and introduce him to Retriever. Birdwell testified that appellant delivered trust documents to his home on August 23, 2000. Thereafter, appellant offered Birdwell annuities, and Birdwell invested $112,000 in an annuity. Later, Brychta came to Birdwell's house to replace some pages on his trust document and introduce him to Retriever. She explained that Retriever bought depressed companies' assets and then sold them at a profit. In June 2002, Birdwell invested $25,000 in Retriever. He received a private placement memorandum, but he did not read it until after Brychta left his house. Brychta did not disclose to Birdwell that Retriever would make loans to appellant and Verkin; that Verkin had filed bankruptcy in 1994; or that Retriever would fund personal injury lawsuits. Birdwell testified that if he had known "about the bankruptcy," he would not have invested in Retriever. In 2003 or 2004, appellant himself visited Birdwell and offered to sell him Retriever stock, but Birdwell declined.

Appellant also sent Brychta to visit 70-year-old Lulah Brown to deliver her trust document and discuss investing in Retriever. After Brychta explained that Retriever invested in credit card debt and distressed real estate, Brown withdrew money she had invested in certificates of deposit and invested it in Retriever. Brown incurred a withdrawal penalty, but was told that Retriever would offset it by providing a better interest rate. Brychta and appellant discussed how Retriever would make up any loss clients would incur from annuity surrender charges, and

appellant explained that Retriever would issue a bonus in the form of additional Retriever shares.

In January 2004, appellant and Brychta discussed selling Retriever stock to Mr. McCollum, who was in his late seventies. Brychta met with McCollum and told him Retriever was financing personal injury lawsuits. At that time, Brychta inquired if Retriever was still investing in distressed assets and Verkin informed her that Retriever was financing lawsuits. McCollum invested in Retriever on January 23, 2004. By that time, Brychta knew that appellant had gone into bankruptcy in May 2003, but she did not tell McCollum about the bankruptcy. She also failed to disclose to McCollum that a cease and desist order had been entered by the Texas State Securities Board against appellant and Brychta.

When Brychta's last client, Gloria Leisure, invested in Retriever in March 2004, Brychta failed to disclose appellant's bankruptcy, the State Securities Board's cease and desist order, and that appellant and Verkin had received loans from Retriever. Brychta also failed to disclose that a consent judgment was entered against appellant, RPH, and Guardian Group in Iowa pursuant to the Iowa Consumer Fraud Act, enjoining appellant and his named companies from soliciting in "Iowa or directing toward Iowa consumers transactions involving timeshares."

Gloria Leisure testified that Brychta contacted her about investing in Retriever after she received an inheritance. Brychta did not tell her what Retriever would use her money for; Brychta told Leisure only that "Retriever would pay good interest." Leisure invested $37,200 in March 2004. Leisure testified that she never saw Retriever's private placement memorandum or Retriever's application and subscription agreement, and that Brychta asked Leisure to sign only one document. Leisure testified that she would have liked to have known how her money would be invested by Retriever. She did not know about the State Securities Board action and the Iowa judgment; nor did she know that Verkin and appellant filed for bankruptcy, or that Retriever invested in lawsuits. She testified that she would not have invested in Retriever had she known appellant and Verkin had filed for bankruptcy and were "doing things that they wasn't [sic] supposed to."

In January 2005, Brychta informed Leisure that there was a problem with Leisure's investment. Later, Brychta called Leisure to tell her that the problem was greater than she anticipated and advised Leisure to call appellant. When Leisure contacted appellant, he was rude and told her that he had been arrested and that the money was gone. Appellant told Leisure not to call Brychta, but to call him instead. However, Leisure could not reach appellant.

Brychta also testified that Drake, who died before trial began, repeatedly told her that appellant and Verkin were "doing some very bad things" and that Drake "was caught in the middle." He advised her to "run far away." Brychta testified that Drake left Capital in late 2003, after he had been disciplined for sexual harassment; he then went to work for Verkin at Retriever. Brychta continued working for appellant at Capital. She testified that, until appellant's arrest, both appellant and Verkin assured her that they were taking care of her clients.

Donald Long testified that he met appellant's employee Drake in January 2002. Drake introduced him to Retriever and visited Long several times. Long cashed in his annuities to invest in Retriever. Long never received Retriever's private placement memorandum or any other doc-

ument describing Retriever's investment plans. Long understood that Retriever would purchase credit card debt. He testified that he would not have invested in Retriever had he known that it would not buy credit card debt and that Verkin filed for bankruptcy in 1994. Long testified that he did not know that Retriever invested in litigation and made loans to appellant and Verkin.

Wallace Thornton testified that Brychta introduced him to Retriever in 2002, when she came to his home to review his trust. Brychta explained that Retriever bought and liquidated small companies. Brychta showed Thornton a private placement memorandum, but he was not allowed to keep it. When he invested $176,000 in Retriever three months after his wife died, he lost $23,000 in the transaction. Brychta assured him that Verkin would make up for the loss by issuing stock in that amount to Thornton. Thornton received Retriever's private placement memorandum months later, but he did not understand it. Thornton was not told that Verkin had filed for bankruptcy or that appellant and Verkin received loans from Retriever.

Anna Weber testified that she attended appellant's seminar after receiving a card in the mail. After the seminar, Drake visited Weber and her husband to talk about trusts. The Webers bought a trust in 2001. Drake then introduced them to Retriever, and they invested approximately $115,000 in Retriever in 2002. The Webers never saw a private placement memorandum, even though Anna asked for one because they wanted to know what they were investing in. Drake explained that Retriever was a brand new fund and that it did not have time to print a prospectus. Drake told the Webers that Retriever invested in buying houses, fixing them up, and reselling them. Based on this information, the Webers invested in Retriever. They did not know that RPH had a service agreement with Retriever and that RPH was appellant's company. The Webers also did not know that Verkin had filed for bankruptcy and that appellant and Verkin would receive loans from Retriever. Weber testified that she and her husband would not have invested in Retriever had they known about these facts.

Appellant argues that this evidence is insufficient to prove that he failed to inform investors that Retriever was using their funds for investments other than distressed assets because Retriever's private placement memorandum was "delivered to all investors [and] clearly and unequivocally indicated REF could invest in any asset it saw fit." Therefore, he contends, all investors were on notice their funds would not necessarily be invested in distressed property. Appellant also argues that the evidence is insufficient because Brychta's testimony "clearly indicates ... many of the investors were told of the risks involved and not all of the investments would be in distressed assets." Appellant stresses that his brother Robert Head, an experienced investor, testified on appellant's behalf that Retriever's private placement memorandum was not unusual or improper.

Contrary to appellant's assertion, the evidence establishes that several investors never saw Retriever's private placement memorandum or did not have a chance to read it before they invested in Retriever. Long, Silverstein, Weber, and Leisure testified that they never saw a Retriever private placement memorandum. Birdwell testified that he received a private placement memorandum but did not read it until Brychta left his house. And Thornton testified that, although Brychta showed him a private placement memorandum, he was not allowed to keep it and received one only months later. There-

fore, these investors were not alerted by Retriever's private placement memorandum that "their funds were not necessarily going to be invested in distressed property."

Appellant also asserts that Brychta told many investors that "not all of the investments would be in distressed assets." The evidence shows that Brychta told only McCollum that Retriever also financed lawsuits.

Further, Robert Head's testimony regarding Retriever's private placement memorandum does not undermine the jury's finding. Investors failed to receive the private placement memorandum or did not receive it before investing. Long, Silverstein, Thornton, Weber, and Birdwell were told that Retriever would invest in distressed assets when appellant and Verkin already knew in January 2002 that Retriever would not invest in distressed assets.

The evidence establishes that appellant and Verkin jointly decided to set up Retriever. Appellant's role in Retriever was to raise money and bring in investors through his successful business at Capital, while Verkin's role was to manage Retriever's day-to-day operations and keep records for investors. Although appellant had no authority to write Retriever's checks and Verkin selected most of Retriever's investments, Verkin testified that appellant and Verkin both knew how Retriever operated and that they talked about Retriever four to five times a day.

The evidence also shows that appellant instructed Brychta to sell Retriever stock without informing her that Retriever would not be investing in distressed assets as he originally told her and as represented by Retriever's private placement memorandum. Even though Verkin informed appellant a month or two after Retriever's incorporation that Retriever would not be investing in distressed assets, appellant never shared this information with Brychta so that she could inform potential investors.

Under the applicable standard of review, the evidence is legally sufficient to support appellant's conviction for securities fraud. Viewing the evidence in a neutral light, we hold that the evidence is not so weak or so contrary to the preponderance of the available evidence as to make the finding of guilt clearly wrong or manifestly unjust. Therefore, the evidence is factually sufficient to support appellant's securities fraud conviction. Accordingly, we overrule appellant's third issue.

### 2. Misapplication of Fiduciary Property

In his first two issues, appellant contends that the evidence at trial is legally and factually insufficient to support his conviction for misapplication of fiduciary property.

A person commits the first-degree felony of misapplication of fiduciary property if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property; and the value of the property misapplied is $200,000 or more, and the offense was committed against an elderly individual. *See* Tex. Penal Code Ann. § 32.45(b),(c)(7), (d) (Vernon Supp. 2008).

A "fiduciary" includes a trustee; and any other person acting in a fiduciary capacity; and an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary. *See id.* § 32.45(a)(1)(A), (C), (D) (Vernon Supp. 2008). "Misapply" means to deal with property contrary to an agreement under which the fiduciary holds the property. *See id.* § 32.45(a)(2)(A) (Vernon Supp. 2008). "Owner" means a person who has

title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor. *See id.* § 1.07(a)(35) (Vernon Supp. 2008).

The jury also was instructed on the law of parties. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

Theall testified at trial that she and her husband Jack met appellant after they set up a trust so that Jack's daughters and Theall's niece and nephew would receive money following their deaths. At that time, appellant accompanied another person who delivered the Thealls's trust document. When Jack died, Theall moved to a nursing home in Texas City and her niece, Broussard, took care of Theall's financial affairs. Appellant handled all of Theall's investments after her husband died. Theall testified that she trusted appellant to handle her investments.

Theall testified that appellant set up the JET and GPT trusts for her. The trusts were set up for the benefit of its "certificate holders," and Theall was the trust certificate holder and "investor." As prescribed by the trusts, the original trustees agreed to perform their duties as set out in the trusts and pledged "their best efforts and interest to managing, preserving, and protecting the assets of [the trusts] for the benefit of the Certificate Holder." Ex-

ercising his authority as "trust protector," appellant fired the original trustees and appointed Verkin as trustee of the trusts in March 2001.

Theall testified that appellant and Verkin visited her at her nursing home when Broussard was not in town to ask her to sign two letters. According to Theall, appellant believed that Verkin should handle her affairs because Broussard did not live in town. Appellant and Verkin convinced her to sign the two letters they brought. One letter was dated November 20, 2002, and stated that Theall agreed to dismiss Broussard as the trustee of the "Jack E. Theall, Jr. and Gladys P. Theall Charitable Remainder Trust dated the 11th day of September, 1997"; this letter appointed Verkin to serve as trustee.[3] The second letter was dated November 18, 2002, and provided in pertinent part:

> The following is an update of my Trustee report of September 04, 2002.
>
> As reported previously, net annuity amounts have been received.... These funds have been invested with Retriever Equity Fund, Inc. .... Retriever Equity Fund, Inc.* granted a bonus on the investment in the full amount of any surrender charges, so that there is *no* penalty.
>
> I continue to maintain a cash reserve account in excess of $100,000 in order to provide necessary expenses you may require as an expense of the trust. If necessary the reserve account can be increased.
>
> * Retriever Equity Fund, Inc. is a broad investor based fund that actively invests in distressed assets. I have an ownership interest in Retriever and I respectfully request that you approve and con-

---

**3.** This trust appears to be an earlier established trust that is not related to the GPT or JET trusts.

sent to this investment by the Trusts and waive any conflict of interest issues. Please sign below to evidence your approval and consent.

I continue to receive questioning from [Broussard's] husband about your investments and money. I have honored your instructions not to discuss these investments except with you. . . .

I authorize and consent.

[Theall's signature]

Theall testified that she understood Retriever would give her a yearly dividend check at a 13 percent interest rate, but she did not know how Retriever was investing money. Theall testified that she did not know that appellant and Verkin had declared bankruptcy; she received this information only after her "money had disappeared." Theall also testified that she did not know a judgment had been entered in Iowa against appellant regarding time shares; that appellant and Verkin would receive loans out of her investment in Retriever; or that Retriever loaned money to fund litigation.

Broussard testified that she took care of Theall's monthly bills and medical needs. She also testified that Theall's assets consisted mainly of stocks and bonds, and that appellant sold these assets for annuities to set up the JET and GPT trusts. According to Broussard, Theall called appellant "her financial guy." Broussard regularly received statements regarding annuities and kept records for Theall.

Broussard spoke with Verkin over the telephone in March or April 2001, because appellant wanted to introduce her to the trusts' new trustee. Appellant explained that he "wanted to go back to Texas with a hometown fellow." After Verkin became trustee, Broussard stopped receiving statements on the annuities; when she questioned appellant about the lack of statements, appellant told her to contact Verkin because he was taking care of the trusts now.

After Broussard sent a letter to Verkin asking about what had happened to $2.3 million the trusts had invested in annuities, Verkin responded that he could not discuss Theall's affairs with Broussard. Broussard hired attorney Michael Guarino to find out what happened to the trusts' annuities; she was informed that $2.3 million from annuities had been invested in Retriever.

With regard to Theall and the trusts, Verkin testified that appellant told him the trusts needed a trustee and the original trustees had been fired. There was evidence that appellant was "trust protector" of the trusts, that he appointed Verkin as trustee of the trusts, and that he introduced Verkin to Theall and Broussard. According to Verkin, appellant told him he had met with Theall and she had agreed to liquidate the trusts' annuities and to invest the funds in Retriever. After appellant's proposal to Theall, Verkin liquidated $2.3 million in annuities, placed the funds in Retriever, and paid commissions to appellant. Verkin did not ask if Theall wanted to invest the funds in Retriever until after they already had been invested.

Verkin testified that he became concerned about whether Theall "knew what she was doing" because Broussard started inquiring about the status of the trusts. Verkin testified that he and appellant first visited Theall at her nursing home in September 2002, to explain which annuities had been cashed in and how the funds had been invested. They visited Theall again in November 2002 and explained that Verkin had an interest in Retriever. According to Verkin, Theall seemed to understand Verkin had an interest in Retriever and Theall signed a letter acknowledging her approval. Verkin confirmed that the

trusts were to be managed for the benefit of the trusts' certificate holder, and that Theall was the certificate holder. Verkin testified that he absolutely considered himself a fiduciary—a person charged with preserving and protecting his client's interest.

Attorney Michael Guarino testified that Theall and Broussard contacted him because they were concerned about the state of the JET and GPT trusts; they understood that annuities had been liquidated but they did not know where the money went. Guarino testified that the surrender penalty on the first cashed in annuity was $139,305.54—about thirty percent of the policy value. The remaining annuities also were cashed in and resulted in similar losses. Guarino testified that Verkin breached his fiduciary duty by engaging in self-dealing instead of acting for the sole benefit of the trusts' beneficiary. Guarino also was concerned about timing: Verkin issued Retriever stock to the trusts between January and September 2002, before Theall consented to the investment in November 2002.

Guarino explained that under both trusts, the trustees pledged "their best efforts and interest in managing, preserving and protecting the assets of the trust for the benefit of the certificate holders of the family trust which are the beneficiaries." Guarino testified that the certificate holder of each trust is Theall.

Guarino further testified that appellant enabled Verkin to gain control of the trusts' funds by appointing him as trustee. According to Guarino, appellant violated his fiduciary duty by failing to protect the trusts and by engaging in self-dealing. Guarino testified that appellant engaged in self-dealing when he accepted loans from Retriever.

Appellant argues in his first issue that the evidence is legally insufficient to sup-port his conviction for misapplication of fiduciary property because the State failed to prove that (1) he was a fiduciary of the JET and GPT trusts; and (2) Theall owned the trusts.

In his brief, appellant makes no argument and provides no applicable authority to support his assertion that he was not a fiduciary of the trusts. After stating that the term " 'fiduciary' includes an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary," appellant asserts that "the record is clear [a]ppellant was neither the trustee nor a fiduciary of the trusts." In the same conclusory manner, appellant asserts that the charging instrument "states [a]ppellant held a fiduciary relationship with Ms. Theall, again a charge that is clearly in contradiction with the facts presented at trial."

■■ Even if appellant had sufficiently briefed an argument that the evidence is legally insufficient to prove he was a fiduciary of the JET and GPT trusts, this argument does not support a reversal of the trial court's judgment. Presuming for the sake of argument that the evidence is legally insufficient in this regard, this court would not reverse appellant's conviction because, as discussed below regarding the second issue, the evidence is sufficient to support appellant's conviction under the law of parties, and appellant is not required to be a fiduciary of the trusts to be convicted under the law of parties. Therefore, appellant's argument that the evidence is legally insufficient to prove he was a fiduciary of the trusts does not support the appellate relief that he seeks.

■■ Appellant also contends that the evidence is legally insufficient to show that Theall owned the trusts' property. Appellant contends that "when a valid trust is created, the beneficiaries become the own-

ers of the equitable or beneficial title to the trust property and are considered the real owners." Therefore, appellant argues that Theall's niece Broussard is the real owner of the trusts' property as the beneficiary of the trusts. According to appellant, Theall was merely the investor or grantor of the trusts.

This contention fails because there is no evidence to suggest that Broussard was the beneficiary of the JET or GPT trusts. According to the trusts' language, the beneficiary of the trusts is the certificate holder; and Theall was the certificate holder of both trusts. Thus, Theall was the beneficiary of both trusts.

Additionally, Guarino testified that Theall is the owner and beneficiary of the JET and GPT trusts. Guarino further explained that, according to the trusts' language, trustees "are pledging their best efforts and interest in managing, preserving and protecting the assets of the trust[s] for the benefit of the certificate holders of the ... trust which are the beneficiaries." Guarino testified that Theall is the certificate holder of both trusts.

Viewing this evidence in the light most favorable to the verdict, we conclude that it is legally sufficient to show that Theall was an "owner" of the trusts within the meaning of the penal statute under which appellant was convicted. We conclude that the evidence is legally sufficient to support appellant's conviction for misapplication of fiduciary property. Accordingly, we overrule appellant's first issue.

■■■ In his second issue, appellant contends that the evidence is factually insufficient to prove he is guilty of misapplication of fiduciary property.

As stated above, a person commits the first-degree felony of misapplication of fiduciary property if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property; and the value of the property misapplied is $200,000 or more, and the offense was committed against an elderly individual. *See* Tex. Penal Code Ann. § 32.45(b),(c)(7), (d).

■■■ The charge authorized the jury to convict appellant as a primary actor or as a party if the evidence showed that appellant acted with intent to promote or assist the commission of the offense by Verkin by encouraging, directing, aiding, or attempting to aid Verkin to commit the offense. *See* Tex. Penal Code Ann. § 7.02(a)(2). Because the jury returned a general verdict finding appellant guilty of misapplication of fiduciary property, we may uphold the verdict if the evidence is sufficient to prove appellant committed the offense either as a primary actor or as a party. *Rabbani*, 847 S.W.2d at 558; *see also Brooks v. State*, 990 S.W.2d at 283.

Appellant claims the evidence is factually insufficient because (1) "[a]ppellant had no knowledge regarding the on goings of [Retriever], no access to the bank accounts and was not privy to Mr. Verkin's conduct relating to investment decisions;" and (2) "[a]ppellant could not have misapplied funds because he never possessed, directed, nor controlled the funds."

The evidence here shows that appellant and Verkin jointly decided to set up Retriever because it provided them an opportunity to make a good income. After appellant and Verkin set up Retriever, there was evidence that appellant, acting as the "trust protector" of the JET and GPT trusts, appointed Verkin as trustee of both trusts. At that time, the bulk of the trusts' assets was placed in annuities with various insurance companies. Verkin testified at trial that appellant told him he met with Theall and she had agreed to liquidate the trusts' annuities so they could

be invested in Retriever. Verkin testified that he did not propose to Theall that the trusts' funds be put in Retriever. Verkin did not meet with Theall regarding investments in Retriever until September 2002, at which time $2.3 million in annuities already had been liquidated and invested in Retriever.

Verkin also testified that appellant knew when Verkin cashed in each annuity. Appellant—as the agent who sold the trusts' annuities—was notified by the insurance companies "because in each instance insurance companies go through what is called a preservation effort ... to try to keep you from cashing" in the annuity. Appellant received a commission each time an annuity was liquidated and borrowed money from Retriever each time an annuity was liquidated.

Verkin further testified that he and appellant visited Theall at her nursing home in September 2002 to explain the status of the trusts' investments, what annuities had been cashed in, and how they had been invested. Verkin testified that in November 2002, they visited Theall again to explain that Verkin had an interest in Retriever. Theall confirmed that Verkin and appellant visited her in November at her nursing home (when Broussard was out of town) to ask Theall to sign two letters.

At the time appellant and Verkin visited Theall to convince her to approve the trusts' investments in Retriever, appellant knew Retriever would not invest in distressed assets because Verkin had told him so. Nevertheless, appellant convinced Theall to (1) sign a letter stating that Retriever actively invested in distressed assets; and (2) agree to the investment.

Evidence that appellant had no access to Retriever's bank accounts does not establish that he "had no knowledge regarding the on goings of" Retriever. Verkin testified that he realized within weeks of Re-

triever's incorporation in December 2001, that Retriever was undercapitalized and needed tens of millions of dollars to be economically feasible. In January or February 2002, Verkin told appellant that Retriever would need millions more to buy enough distressed assets to be profitable. Verkin told appellant that Retriever would not be investing in distressed assets, and asked appellant to start looking at other investment opportunities. Verkin also told appellant that he would explore investing in litigation. Appellant responded that he would increase the frequency of his seminar presentations to attract more investors. Verkin also testified that, although he selected most of Retriever's investments, appellant and Verkin both knew how Retriever operated and what Retriever was doing.

Although appellant was not paid under the service agreement, appellant was paid a 10 percent commission on the money investors invested in Retriever. Appellant was paid more than $200,000 in commissions for the money the JET and GPT trusts invested in Retriever.

Steven Schulz, an attorney and court-appointed receiver for Retriever, testified that appellant contacted him several times in the two years before trial and was helpful in providing information about Retriever. Appellant gave Schulz better information than Verkin did about the "Medallion" case Retriever funded.

This evidence supports a finding that appellant encouraged and aided Verkin in misapplying the trusts' property and therefore was guilty as a party. Viewing all of the evidence in a neutral light, the evidence supporting the verdict is not so weak or so contrary to the preponderance of the available evidence as to make the finding of guilt clearly wrong or manifestly unjust. The evidence is factually sufficient

to sustain appellant's conviction. Accordingly, we overrule appellant's second issue.

## B. Jury Charge

In his fourth issue, appellant argues that the trial court erred by submitting a charge to the jury on the offense of misapplication of fiduciary property that contained a broader claim than was authorized by the indictment. Appellant argues that the indictment alleged he misapplied property he held as a "fiduciary, to-wit: as a trustee," but the application paragraph in the jury charge merely stated that appellant misapplied property he held as a "fiduciary." Appellant contends that the jury charge "allowed the jury to convict [a]ppellant under a different theory and allowed the jury to find [a]ppellant guilty if they believed him to be a fiduciary of the trusts." Appellant contends that this error caused him egregious harm.

Implicit in appellant's argument is his assumption that the operative indictment is the March 2006 re-indictment for misapplication of fiduciary property. The March 2006 indictment contains the language "fiduciary, to wit: as trustee." The State contends that the March 2006 indictment was amended and no longer was the operative indictment. The State argues that the amended indictment deleted the word "trustee" from the March indictment, and that the jury charge comported with this amended indictment.

We first consider whether the March indictment was amended and, thus, ceased to be the operative indictment in this case. The latest pronouncement on how an indictment may be effectively amended is found in *Riney v. State*, 28 S.W.3d 561, 565–66 (Tex.Crim.App.2000). *Riney* overruled *Ward v. State*, 829 S.W.2d 787 (Tex. Crim.App.1992), which held that "the only effective means of accomplishing an amendment was by interlineation; the ac-

tual, physical alteration of the face of the charging instrument." *Id.* at 565–66.

In *Riney*, the State filed a motion to amend just before trial asking to change the name of the substance alleged and the amount allegedly possessed by the defendant in the indictment. *Id.* at 563. The State attached to its motion a photocopied duplicate of the first page of its copy of the indictment; the trial court granted the State's motion *Id.* The photocopy was interlineated, but the record did not reveal who physically interlineated that photocopy. *Id.* The record revealed that the trial court read the changes into the record, and that the amended copy was incorporated into the court clerk's file. *Id.* The trial court asked defense counsel and the defendant whether they had any objections to the amendments, and both replied they had no objections. *Id.* The trial court then formally arraigned the defendant by reading from the amended indictment in open court, to which the defendant pleaded "not guilty." *Id.* at 564.

On appeal, the defendant argued that the indictment was amended improperly because only a photocopy of the State's indictment—and not the original indictment—was interlineated. *Id.* The Court of Criminal Appeals disagreed and held that the amendment was effective. *Id.* at 564–65. The court stated that "requiring physical interlineation of the original [indictment] as the only means to accomplish an amendment is unwarranted. Physical interlineation is an acceptable but not exclusive means of effecting an amendment to an indictment." *Id.* at 565. The court also stated that "resolutely clinging to the notion that an amendment can be accomplished *only* by the physical interlineation of the original indictment provides a defendant with the opportunity to subvert the process of which he was fully aware and

had affirmatively acknowledged." *Id.* at 565 (emphasis in original).

We do not read *Riney* to say that interlineation of a copy is the only effective way to amend an indictment. *Riney* identified one set of circumstances under which an indictment effectively was amended. *See id.* at 566. The court considered that "[w]hen the State produced a copy of the original indictment, it was interlineated and incorporated into the court clerk's file, all with appellant's specific knowledge and express approval." *Id.* at 566.

Appellate courts have applied *Riney*'s rationale in circumstances in which amendments were accomplished by means other than interlineation on a copy of the indictment. In *Westmoreland v. State,* 174 S.W.3d 282, 285–87 (Tex.App.-Tyler 2005, pet. ref'd), the court held that an indictment effectively was amended when (1) the State filed a motion to amend the indictment which contained the language of the original indictment and the requested amending language; (2) the defendant was present at the hearing on the motion to amend, had notice of the intended amendment, and did not object to the amendment; and (3) the order granting the motion to amend included the amended language. *Id.* at 287. The court held that the order was sufficient to put the defendant on notice of the amended language in the indictment. *Id.*

In *Aguilera v. State,* 75 S.W.3d 60, 64 (Tex.App.-San Antonio 2002, pet. ref'd), the court held that the amendment to an indictment was effective where the trial court granted the State's motion to amend the indictment and issued an order restating the language from the original indictment in its entirety with the amendment. *Id.*

In *Harrison v. State,* No. 05–07–00453–CR, 2008 WL 2514333, at *1 (Tex.App.-Dallas June 25, 2008, no pet.) (mem. op.,

not designated for publication), the court held that the indictment was effectively amended where the record showed that (1) the State's motion to amend contained a copy of the amended indictment language; (2) an order granting the amendment was signed by the trial court; (3) the defendant did not object to the method of amendment used; (4) the defendant affirmed that he had reviewed the indictment and understood the charges against him; and (5) the defendant waived arraignment and reading of the indictment. *Id.* The court also stated, "[w]e interpret *Riney* as allowing flexibility in amending indictments provided that the method of amendment employed produces an amended copy of the indictment incorporated into the record under the direction of the trial court sufficient to give the defendant fair notice of the charges." *Id.*

In *Barnes v. State,* No. 03–03–00533–CR, 2007 WL 1647827, at *2 (Tex.App.-Austin June 7, 2007, pet. ref'd) (mem. op., not designated for publication), the court held that an indictment can be amended under *Riney* by incorporating into the trial court's file a separate document containing the text of the amended charging language. *Id.* The court concluded that the indictment effectively was amended because the clerk's record contained the original information, the State's motion to amend specifically setting out the proposed amendment, and the court's order specifically setting out the amended language. *Id.*

■ Under *Riney,* an interlineation on the original or a copy of the indictment is not the only acceptable method of accomplishing an amendment. Nevertheless, *Riney* teaches that the language of the amended indictment must be memorialized in a written document and the amendment must be granted by the trial court. *See*

*Riney,* 28 S.W.3d at 565–66; *see also Westmoreland,* 174 S.W.3d at 285–87; *Aguilera,* 75 S.W.3d at 64.

Here, the State filed its motion to amend the indictment several months before trial began. The trial court did not sign an order granting the State's motion. Before voir dire on June 11, 2007, the State announced on the record that, although no order had been signed granting its motion to amend, appellant agreed to the amendment in February. According to the State, appellant agreed to the amendment if the State agreed to his continuance. Appellant did not deny the agreement. After this discussion, the trial court did not sign an order granting the State's motion to amend. The trial court never manifested an intention to grant the State's motion to amend; nor did the trial court state that it was amending the indictment.

■ The State's written motion to amend the indictment containing the requested amending language is not sufficient to accomplish an amendment when there is no indication in the record that the trial court granted the State's motion to amend.[4] Accordingly, we agree with appellant that the operative indictment was the 2006 indictment containing the "fiduciary, to-wit: as a trustee" language.

■ We next address appellant's assertion that he was egregiously harmed by the trial court's failure to submit a jury charge that referred to appellant merely as fiduciary. We review a claim of jury-charge error using the procedure set out in *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985). *Barrios v. State,* 283 S.W.3d 348, 350 (Tex.Crim.App.2009).

The first step is to determine whether there is charge error. *Id.* If there was error and appellant objected to the error at trial, reversal is required if the error is calculated to injure the defendant's rights—meaning there must be some harm to the defendant from the error. *Id.* If the appellant did not object at trial, the error must be "fundamental," and reversal is required "only if the error is so egregious and created such harm" that the defendant did not have a fair and impartial trial. *Sakil v. State,* 287 S.W.3d 23, 25–26 (Tex. Crim.App.2009) (quoting *Almanza v. State,* 686 S.W.2d at 171).

■ We determine "egregious harm" by examining the entire jury charge; the state of the evidence, including the contested issues and weight of the probative evidence; the arguments of counsel; and any other relevant information revealed by the record of the trial as a whole. *Warner v. State,* 245 S.W.3d 458, 461 (Tex.Crim. App.2008). The appellant must have suffered actual rather than theoretical harm. *Id.*

Here, the jury charge tracked the indictment's language but omitted the phrase "to-wit: as a trustee" relating to fiduciary. Appellant argues that the charge "expanded upon the allegations in the indictment" and allowed the jurors to convict him of misapplication of fiduciary property "if they believed him to be a fiduciary" but not a trustee.

---

4. The *Riney* court also stated that it was not overruling the part of *Ward* in which the *Ward* court concluded that " '[n]either the motion [to amend] itself nor the trial judge's granting thereof is an amendment; rather the two comprise the authorization for the eventual amendment of the charging instrument pursuant to Article 28.10.' " *Riney,* 28 S.W.3d at 566 (quoting *Ward,* 829 S.W.2d at 793). We need not and do not address whether the State's written motion to amend, containing the requested amending language, would be sufficient to accomplish an amendment if the trial court had indicated in the record that it granted the State's motion to amend.

A defendant is to be tried only on the crimes alleged in the indictment. *Abdnor v. State,* 871 S.W.2d 726, 738 (Tex. Crim.App.1994). The jury charge may not enlarge the offense alleged and authorize the jury to convict a defendant on a basis or theory permitted by the jury charge but not alleged in the indictment. *See Reed v. State,* 117 S.W.3d 260, 265 (Tex.Crim.App. 2003); *Castillo v. State,* 7 S.W.3d 253, 258–59 (Tex.App.-Austin 1999, pet. ref'd). Accordingly, the trial court erred in improperly broadening the indictment by failing to add the phrase "to-wit: as a trustee" relating to fiduciary. *See Reed,* 117 S.W.3d at 265; *Castillo,* 7 S.W.3d at 258–59.

Because appellant did not object to the charge, we next examine whether he was egregiously harmed by the trial court's error. *Warner,* 245 S.W.3d at 461. Appellant contends that he was egregiously harmed because there is no evidence that he was a trustee.

Appellant's argument fails because he was charged under the law of parties. Accordingly, he was criminally responsible for misapplication of fiduciary property committed by Verkin if, acting with intent to promote or assist the commission of the offense, he solicited, encouraged, directed, aided, or attempted to aid Verkin commit the offense. *See* Tex. Penal Code Ann. § 7.02(a)(2). If the trial court had tracked the indictment language and added the language "to wit: as a trustee" to the jury charge in the section relating to appellant's own conduct as a principal, then the court also would have added the "to wit: as a trustee" language in the section relating to Verkin's conduct and appellant's responsibility as a party for Verkin's conduct.

Verkin testified that he pleaded guilty to the offense of misapplication of fiduciary property because he was in fact guilty. Appellant appointed Verkin as trustee of the JET and GPT trusts. Verkin testified that he liquidated all of the trusts' annuities and invested the money in Retriever. This investment caused an immediate loss in surrender penalties. Verkin never asked Theall if she wanted to invest in Retriever until after he had made the investment. After the trusts's annuities had been liquidated and the money had been invested in Retriever, Verkin and appellant persuaded Theall to approve Retriever investments and waive "any conflict of interest issues" arising from Verkin's ownership of Retriever.

The evidence establishes that Verkin misapplied the trusts' property he held as a trustee in a manner that involved substantial risk of loss to Theall, the owner of the trusts' property. Further, the evidence shows that appellant, with the intent to promote or assist the commission of the offense of misapplication of fiduciary property, encouraged, directed, or aided Verkin to commit this offense.

Appellant's role with respect to Retriever was to raise money. Within weeks of Retriever's incorporation, Verkin told appellant that Retriever would not invest in distressed assets as originally contemplated and asked appellant to start looking at other investment opportunities. Verkin testified that appellant told him that he met with Theall, and that she agreed to liquidate the trusts' annuities and invest the funds in Retriever. After appellant proposed the Retriever investment to Theall, Verkin liquidated $2.3 million in annuities and placed the funds in Retriever. Appellant collected a commission each time Verkin cashed in the trusts' annuities.

Verkin testified that he became concerned about whether Theall "knew what she was doing" because Broussard started inquiring about the status of the trusts. Verkin testified that he and appellant visit-

ed Theall in September 2002 to explain which annuities had been cashed in and how the funds had been invested. Appellant and Verkin visited Theall again in November 2002. According to Theall, appellant believed Verkin should handle all of her affairs. Theall testified that appellant and Verkin convinced her to sign a letter approving the investment in Retriever.

Based on this evidence, we conclude that, even if the trial court had added the "to wit: as a trustee" language in the jury charge, there is sufficient evidence that appellant, with the intent to promote or assist trustee Verkin, encouraged, directed, or aided Verkin to commit the offense of misapplication of fiduciary property. Accordingly, we cannot conclude that the charge error caused appellant egregious harm requiring reversal. We overrule appellant's fourth issue.

### C. Continuance

In his fifth issue, appellant contends that the trial court committed reversible error when it denied a June 4, 2007 motion to continue the June 11, 2007 trial.

The denial of a motion for continuance rests within the trial court's sound discretion. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex.Crim.App.2006). A defendant must show "specific prejudice to his defense" to establish that the trial court abused its discretion in refusing to grant a continuance. *Id.* Examples of specific prejudice include unfair surprise, an inability to effectively cross-examine witnesses, and the inability to elicit crucial testimony from potential witnesses. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim.App.1996). No abuse of discretion is shown based on an assertion that counsel did not have time to investigate adequately for potential mitigating evidence when there is no showing of harm. *Heiselbetz v.*

*State*, 906 S.W.2d 500, 512 (Tex.Crim.App. 1995).

Appellant contends on appeal that the trial court abused its discretion by denying his June 4, 2007 motion for continuance because his "trial counsel had no information the trial was set for June 11, 2007" and therefore was unprepared to file "appropriate motions relating to the charging instruments."

The record does not support appellant's assertion that his trial counsel was unaware of the June 11, 2007 trial setting. Before trial began, appellant testified that he attended a pretrial hearing on June 4, 2007, to which he brought a motion for continuance his trial counsel had given him on June 3, 2007 to present to the court. Trial counsel prepared the motion for continuance, in which he acknowledged that trial was set for June 11, 2007. Therefore, appellant's trial counsel knew of the June 11, 2007 trial setting.

Appellant also contends he was prejudiced by the denial of the June 4, 2007 continuance motion because he had no opportunity to obtain "information regarding certain bank accounts" from Verkin, who exercised his right to remain silent until he pleaded guilty on April 18, 2007. Appellant contends these bank accounts would have assisted his trial counsel in showing that (1) Verkin was the sole manager of Retriever funds; (2) Verkin misappropriated funds and used them to pay for personal expenses; (3) "Verkin had not been completely truthful" about the amounts of money he had obtained, locations of the monies, and the use of monies; and (4) appellant had no knowledge of Verkin's spending.

On April 19, 2007, appellant's trial counsel received notice that Verkin had pleaded guilty on April 18, 2007. By the time Verkin pleaded guilty, appellant's trial counsel had filed six motions for continu-

ance. Each motion alleged different grounds. Appellant's trial counsel filed another motion for continuance on April 23, 2007, requesting an order continuing the scheduled trial setting of April 30, 2007 in light of Verkin's guilty plea. Because Verkin waived his Fifth Amendment privilege against self-incrimination when he pleaded guilty, appellant's trial counsel asked that Verkin be required to provide the State with a "complete accounting with supporting financial records, of all expenditures made with investors' funds including those funds deposited in foreign accounts in Nicosia, Cyprus which the State claims it unsuccessfully attempted to obtain through the Hague Convention or other international process." Trial counsel also claimed that he "must now fully investigate fifty specific financial transactions listed in the indictment in order to prove his innocence and to trace the control and beneficial enjoyment of the funds." Trial counsel further claimed that a continuance was necessary to allow him "[t]o interview Verkin and other witnesses and to 'further investigate the matters pertaining to Verkin's proposed testimony.'"

The subject of appellant's complaint on appeal is the trial court's denial of his eighth motion for continuance filed on June 4, 2007. In the eighth motion, trial counsel argued that the lack of complete discovery prevented him from adequately preparing for trial until October 15, 2007. Trial counsel claimed that "the State is in the position to demand and enforce full disclosure from its alleged witnesses concerning the whereabouts of any missing records," and that missing financial records include transfer of funds offshore to a bank in Nicosia, Cyprus by Verkin or companies he controlled. Trial counsel also claimed that, if appellant were forced to go to trial before resolution of his bankruptcy case, "he will be denied potential exculpa-

tory evidence which destroys the State's case against him."

On June 11, 2007, the trial court heard argument before trial began on the June 4, 2007 motion for continuance. Appellant's trial counsel argued that he had not received any documents relating to bank accounts in Cyprus to which $600,000 had been diverted. He argued that it was essential for him "to know how these funds were spent because ... [appellant] is accused of misapplying funds. And part of the theory of the misapplication is that ... [appellant] benefitted from the funds personally." Trial counsel argued that the State was required to provide him with exculpatory evidence showing what Verkin spent on himself and his family.

The State responded that it had produced about 4,000 documents in June 2006, and had provided another 400 documents to appellant's trial counsel thereafter, including every check written by Retriever, and anything the State intended to use at trial. The State also argued that trial counsel was free to subpoena any records he needed. Appellant testified that he told his trial counsel about several bank account numbers a few months before trial so that his trial counsel could obtain records.

The trial court questioned trial counsel about why he had not filed a motion to compel or a motion for discovery and set it for hearing before trial. Trial counsel stated that he communicated only with the State. The trial court also noted that trial counsel had months to find out what he needed to prepare for trial and that he knew since April that Verkin had pleaded guilty.

This record shows that trial counsel had several months to obtain the bank account information if he deemed it necessary for appellant's defense. The evidence also shows that trial counsel had almost two

months from the time he learned that Verkin had pleaded guilty to obtain any information he deemed necessary with respect to "certain bank accounts" he now claims could have assisted him at trial.

Appellant fails to explain how he was prejudiced by not obtaining "information regarding certain bank accounts." Appellant argued that these bank accounts would have shown that Verkin managed all Retriever funds and that Verkin misappropriated funds to pay for his personal expenses. However, even without this bank account information, the evidence showed that Verkin's role was to manage Retriever and that Verkin misappropriated funds and used them to pay for personal expenses. Verkin himself testified to that effect at trial.

These circumstances demonstrate that trial counsel did not need these bank accounts to show Verkin managed Retriever and spent Retriever money for personal expenses. Further, the evidence showed that appellant was aware of Retriever's dealings and investments. Appellant does not explain how information relating to "certain bank accounts" could have established that he "had absolutely no information or knowledge" regarding how Verkin spent Retriever funds.

Additionally, appellant questioned Retriever's court-appointed receiver at trial regarding a $600,000 check that went to a bank in Cyprus. The receiver, Schulz, testified that he asked attorney John Campbell to look into whether the check that went to Cyprus was related to Retriever. Campbell told Schulz that the $600,000 check that went to Cyprus had nothing to do with Retriever. Appellant also questioned Schulz about six different bank account numbers, but Schulz did not recognize any of the account numbers as having any connection to Retriever.

We conclude that appellant failed to establish that he was prejudiced by the trial court's denial of appellant's eighth motion for continuance. We overrule appellant's fifth issue.

**D. Ineffective Assistance of Counsel Claim**

■ In his sixth issue, appellant argues that he should be granted a new trial because he was denied effective assistance of counsel.

To prevail on an ineffective assistance claim, appellant must show that: (1) his trial counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for the error, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. 510, 521, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Cannon v. State*, 252 S.W.3d 342, 348–49 (Tex.Crim. App.2008). Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Garza v. State*, 213 S.W.3d 338, 348 (Tex.Crim.App.2007).

If the reasons for counsel's conduct at trial do not appear in the record and it is at least possible that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal. *Id.* To warrant reversal where trial counsel has not been afforded an opportunity to explain those reasons, the challenged conduct must be " 'so outrageous that no competent attorney would have engaged in it.' " *Roberts v. State*, 220 S.W.3d 521, 533–34 (Tex.Crim.App.2007), *cert. denied*, 552 U.S. 920, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App.2005)). A vague, inarticulate sense that counsel could have provided a better defense is not a legal

basis for finding counsel constitutionally deficient. *Bone v. State*, 77 S.W.3d 828, 836 (Tex.Crim.App.2002).

Appellant primarily relies on *Cannon v. State*, 252 S.W.3d at 348–350, to support his contention that "trial counsel's performance in this matter was ineffective per say [sic]" and that trial counsel was completely unprepared. In that regard, appellant claims his trial counsel was ineffective because (1) he "attempted to ask for a continuance explaining that he did not know he was going to trial on June 11, 2007;" (2) he was not "physically present at the two last court settings;" (3) appellant notified trial counsel that trial was set for June 11, 2007; (4) counsel admitted he was not familiar with six bank accounts which allegedly related to Verkin and his activities, and this ignorance prevented trial counsel from cross-examining Verkin; (5) trial counsel did not know which charging instrument would be used at trial; (6) the trial court had to "tell trial counsel he needed to file a motion designating punishment option;" and (7) trial counsel admitted that he was not experienced in criminal cases.

The present case is distinguishable from *Cannon*. In *Cannon*, defense counsel refused to participate in the two-day jury trial. 252 S.W.3d at 350. After the trial court denied defense counsel's motions for continuance and recusal, counsel declared that he was not ready for trial, that he was unable to effectively represent his client, and that he therefore would not participate in the trial. *Id.* Defense counsel declined to (1) participate in jury selection; (2) enter a plea for his client; (3) make an opening or closing statement; (4) cross-examine any of the State's witnesses; (5) make any objections; (6) offer any defense; (7) request any special jury instructions; or (8) offer any evidence or argument with respect to punishment. *Id.* The

Court of Criminal Appeals held that counsel's behavior, considered as a whole, constructively denied appellant his right to effective assistance of counsel because counsel "effectively boycotted the trial proceedings and entirely failed to subject the prosecution's case to meaningful adversarial testing." *Id.* at 350–52.

Here, appellant's trial counsel did not refuse to participate during the proceedings or announce he was unprepared to go forward. Instead, the record reflects that appellant's trial counsel participated in all aspects of appellant's trial. Trial counsel participated in jury selection, made opening and closing statements, filed motions, made objections, cross-examined the State's witnesses, called defense witnesses, and requested special jury instructions.

Further, the record does not support appellant's assertion that his trial counsel was completely unprepared. The record shows that trial counsel knew that trial was scheduled to begin on June 11, 2007. As discussed in more detail in connection with appellant's fifth issue, trial counsel prepared a motion for continuance regarding the June 11, 2007 trial setting by June 3, 2007. Trial counsel therefore knew no later than June 3, 2007 that trial was set for June 11, 2007. Additionally, trial counsel acknowledged receiving a letter from the State on April 27, 2007, in which the State asked trial counsel to set any discovery hearing before the next trial setting on June 11, 2007.

Trial counsel was familiar enough with both charging instruments to argue their contents before trial began. Trial counsel knew what the indictments in both causes alleged and complained about not receiving 10 days' notice to plead to the re-indictment in the securities fraud case—although he acknowledged receiving service of the re-indictment on April 28, 2007. Trial counsel also objected to the State's

motion to amend the re-indictment for securities fraud, and the trial court did not grant the amendment with respect to securities fraud. Trial counsel did not object to amending the indictment for misapplication of fiduciary property.

Appellant attended the June 4, 2007 pretrial hearing without counsel. Trial counsel stated that he was unable to attend the June 4 hearing due to a conflict, but he gave appellant a motion for continuance to present to the trial court. The State was also not present at the June 4, 2007 pretrial hearing. Trial counsel was also unable to attend a previous pretrial hearing with appellant, but trial counsel stated that appellant was not alone and was accompanied by the attorney who represented him in his "gambling case."

Appellant claims that the "court had to tell trial counsel to file a motion designating punishment option," referring to the following exchange:

THE COURT: The clerk has a question. She wants to know if your client is eligible for probation and you filed a motion for probation.

TRIAL COUNSEL: My client, I believe, would be eligible, no prior convictions.

THE COURT: In order to get it, you have to file a motion.

TRIAL COUNSEL: We're going to file it now with your kind assistance.

This exchange does not support appellant's assertion when viewed in the proper context. The exchange does not indicate that trial counsel did not know that he had to file a motion designating a punishment option. Rather, after trial counsel answered the clerk's question, the trial court simply stated that trial counsel needed to file a motion. Nothing in this exchange establishes that trial counsel did not know himself that he needed to file a motion.

Additionally, appellant incorrectly claims that trial counsel admitted a number of times that he was not experienced in criminal cases. Appellant has not pointed to any record cite to support his assertion, nor have we found any such statement made by trial counsel.

Lastly, appellant claims that trial counsel "admitted his ignorance regarding SIX bank accounts relating to Mr. Verkin and his activities," and that this ignorance prevented trial counsel from cross-examining Verkin to demonstrate where and how Verkin manipulated Retriever funds. The record does not reflect that trial counsel had any difficulties cross-examining Verkin at trial. Verkin himself admitted that he used Retriever funds to pay for his personal expenditures and that Retriever checks were written to his wife and son. Financial analyst Sedwick confirmed that 41 percent of Retriever funds went to Verkin personally, his companies, his wife, or his son.

Finally, appellant makes no effort to explain how any of his trial counsel's alleged deficiencies prejudiced him. For the foregoing reasons, we overrule appellant's sixth issue.

### E. Attorney–Client Privilege

In his seventh issue, appellant argues that the trial court erred by allowing Verkin to testify at trial because he was appellant's attorney.

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services. Tex.R. Evid. 503(b); *Austin v. State*, 934 S.W.2d 672, 673 (Tex.Crim.App. 1996). Therefore, application of the attorney-client privilege depends on whether the communication sought to be protected is "confidential." *Austin*, 934 S.W.2d at

674. A communication is "confidential" if it is not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client. *Id.* The client bears the burden of establishing the existence of the privilege. *Id.*

 The attorney-client privilege promotes communication between attorney and client unrestrained by fear that these confidences may later be revealed. *Id.* at 673. Statements and advice of the attorney are just as protected as the communications of the client. *Id.* Attorneys may testify regarding information they possess about a client so long as no communication is revealed. *Id.*

Appellant contends on appeal that "the case at bar clearly involves an attorney-client relationship" and that the trial court erred in allowing Verkin to testify at trial. However, appellant presents only the following conclusory statement to support his issue: "All of the testimony provided by Mr. Verkin was in violation of the attorney-client privilege and the admission of all such evidence was error. Appellant prays that the Court reverse his convictions on all counts and order a new trial."

This conclusory statement is insufficient to establish that all of Verkin's testimony was inadmissible. The record contains nearly 200 pages of Verkin's testimony recorded over a two-day period. Appellant makes no effort to explain what part of Verkin's testimony was based on communications that were confidential and made for the purpose of facilitating the rendition of professional legal services, and what part of Verkin's testimony was based simply on his unprivileged personal observations. *See Manning v. State,* 766 S.W.2d 551, 556 (Tex.App.-Dallas 1989)(attorney's testimony regarding observations he made did not violate the attorney-client privilege), *aff'd,* 773 S.W.2d 568, 568–69 (Tex.Crim.App.1989)(per curiam)(adopting court of appeal reasoning as sound). This conclusory assertion provides no basis for reversal.

Accordingly, we overrule appellant's seventh issue.

### Conclusion

Having overruled appellant's issues presented on appeal, we affirm appellant's conviction for misapplication of fiduciary property in cause number 14–07–00855–CR; and we affirm appellant's conviction for securities fraud in cause number 14–07–00856–CR.