**AFFIRM; Opinion Filed October 23, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00521-CR

### NEIMAN LAQUINTA MCDONALD, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the Criminal District Court No. 7
### Dallas County, Texas
### Trial Court Cause No. F10-54350-Y

## OPINION

Before Justices Moseley, Lang, and Richter[1]
Opinion by Justice Lang

Following a plea of not guilty, appellant Neiman Laquinta McDonald was convicted by a jury of felony murder. Punishment was assessed by the jury at fifty years' imprisonment and a $10,000 fine.

Appellant asserts six issues on appeal. Specifically, appellant contends the trial court erred by (1) not instructing the jury on the lesser included offense of aggravated robbery and "the proper standard of proof for extraneous offenses," (2) allowing "extraneous offense testimony" at the guilt/innocence phase of the trial "that [a]ppellant had been trying to sell a shotgun two or three days prior to the shooting" and "concerning a counterfeit $100 bill," (3) submitting a jury charge that included an application paragraph that erroneously permitted conviction on a theory

---

[1] The Hon. Martin Richter, Justice, Assigned

not alleged in the indictment, and (4) rendering judgment that appellant pay $464 in court costs based upon insufficient evidence because the clerk's record does not contain a bill of costs.

For the reasons below, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case alleged that on approximately April 11, 2010, appellant

did unlawfully . . . intentionally and knowingly commit and attempt to commit the felony offense of AGGRAVATED ROBBERY and while in the course of and in furtherance of the commission of and attempt to commit said offense, did then and there commit an act clearly dangerous to human life, to-wit: DISCHARGE A FIREARM AT AND IN THE DIRECTION OF KENDRICK CARDELL and did thereby cause the death of an individual, KENDRICK CARDELL.

(emphasis original).[2]

Prior to the presentation of evidence in the guilt/innocence phase of trial, the trial court held a hearing outside the presence of the jury respecting the admissibility of evidence pertaining to (1) an alleged attempt by appellant to sell a shotgun several days before the offense in question and (2) an additional robbery allegedly committed by appellant on the same night as the offense alleged in the indictment. At the hearing, Michael Felder testified he has known appellant "for some years." Felder stated that "some days before" the date of the offense alleged in this case, appellant had been trying "through text and over the phone" to sell him a "chrome pump shotgun" with a "grip handle." Felder testified he "never got interested" and "just left it alone."

On cross-examination, Felder stated that a photograph of a gun was "texted" to him two or three days before the shooting in this case. Further, Felder testified in part as follows:

Q. And that text actually came from [Cordell]?

---

[2] The last name of the individual whose death was allegedly caused by appellant is spelled "Cardell" in the indictment and the charge of the court, but is spelled "Cordell" throughout the reporter's record in this case. We refer to that individual as "Cordell" or "the complainant" in this opinion.

A. I got a text from both of them.

Q. But the only one you were able to show the [police] was from [Cordell]?

A. I don't even have that phone anymore, so I don't know—
. . . .
Q. Would it surprise you if you told [police] [Cordell] was the one who sent you that text?

A. No, sir.

Q. So [Cordell] was actually the one who was trying to sell the gun you think for [appellant]?

A. No, sir, both of 'em—both of 'em had. I had talked to both of 'em about the gun.

Additionally, Felder stated (1) the person holding the gun in the photograph texted to him was a female and (2) he had never seen appellant holding the gun or in possession of the gun and had not seen the gun in appellant's car or house.

Mary Lou Gonzales testified that at approximately 11:45 p.m. on April 10, 2010, she was driving her son's father, Ruben Martinez, and two of their children home from a cookout. She stated that at the request of Martinez, she pulled her truck over to the side of the road and stopped so he could urinate. Martinez got out of the truck and Gonzales remained inside. Gonzales stated that while she was stopped, a car with four people in it passed by. She testified that a "couple of minutes" later, she heard Martinez speaking with someone. Then, she testified, there was somebody at her window. According to Gonzales, the person at her window told her to "give everything I had." She testified she gave them what she had with her. Photographs labeled "State's Exhibit No. 22" and "State's Exhibit No. 23" were admitted into evidence for purposes of the hearing. Gonzales testified that a makeup bag pictured in those photographs belonged to her and was taken from her on the night in question. Gonzales testified she did not see "the whole face" of the person who approached her window and could not identify the sex of that person or the others in the car.

–3–

Martinez testified that after Gonzales stopped by the side of the road as described above, he was standing outside of the truck. He stated that a car approached with "two girls driving" and two "guys" in the back. Martinez testified the two guys got out of the car and one of them pressed a shotgun to Martinez's chest and demanded his money. Martinez stated he gave them his cell phone and Gonzales's makeup bag. Then, Martinez testified, "they just took off." Martinez reported the incident to police. He testified he was shown a photographic lineup at the police station and was able to identify photograph number two in that lineup as the person who pressed the shotgun to his chest. On cross-examination, Martinez testified that the document signed by him at the police station at the time he viewed the lineup showed he did not mark "yes" as to any of the photographs in the lineup. A copy of the photographic lineup shown to Martinez was admitted into evidence for record purposes.

Detective Donald Randle testified he prepared a "blind sequential lineup" that was shown to Martinez at the police station after the incident described above. Randle stated that one of the photographs in the lineup shown to Martinez was a photograph of appellant. According to Randle, Martinez was initially "adamant" that the person in photograph number two of the lineup was the person who had pointed a gun at him, "but then he went to thinking he was not one hundred percent sure." On cross-examination, Randle testified police records show no identification was made by Martinez.

Counsel for appellant argued in part at the suppression hearing

> Before they can actually present anything to the jury, they not only have to show probable cause, but they've got to show the court that they've got proof that would rise to the level of beyond a reasonable doubt to be able to go into these extraneous offenses for this purpose. They don't do that, Judge.
> As to Mr. Felder's testimony, there's certainly no testimony from him that he's ever seen personally any weapon that they want to try to suggest that [appellant] had. He's never seen [appellant] in possession of a weapon. He's testified specifically to that, so I think that testimony is barred as well.

The trial court ruled that the evidence in dispute was admissible. The trial court stated in part, "It's inextricably intertwined with the charged offense and it's re [sic] gestae."

During the guilt/innocence phase of trial, Officer Kakia Lang of the Dallas Police Department testified before the jury that at approximately midnight on the night in question, she was dispatched to the scene of a shooting on Etta Drive in Dallas County. Lang testified she observed a male homicide complainant who appeared to have been shot in the head. She stated the complainant was wearing white plastic gloves. Also, Lang testified, she observed a hammer on the ground. Lang stated that a person she later identified as Bonnie Ruiz was at the scene and was crying and "hysterical." Additionally, Lang testified, police obtained statements from other complainants at the scene respecting an alleged aggravated robbery. Photographs of the crime scene and the vehicles involved were admitted into evidence, published to the jury, and described by Lang.

Ruiz testified that at the time of the events giving rise to this case, Cordell had been her boyfriend for approximately six and one-half years. Ruiz stated appellant and Cordell had been "hanging around with each other" for about one and one-half months and were "pretty close."

Ruiz testified that at approximately 10 p.m. on the night in question she picked up Cordell from his mother's house. Then, Ruiz and Cordell drove in Ruiz's car to some apartments on Overton to pick up appellant and appellant's girlfriend, Ranisha. Ruiz testified it was her understanding that the four of them were "going to go and hit a lick," which meant "[g]o and rob someone." According to Ruiz, appellant had a shotgun with him. Ruiz stated that the shotgun was silver and "long."

Ruiz testified she drove the car "here and there" as directed by Cordell and appellant. She stated Cordell was sitting in the front passenger seat, Ranisha was in the back seat behind Cordell, and appellant sat behind Ruiz. According to Ruiz, after "awhile," Cordell and appellant

saw a truck pulled over on the side of the road and told Ruiz to stop. Ruiz did so. Ruiz stated she saw a woman in the driver's seat of the truck and a man standing outside of the truck by the side of the road. Ruiz stated the man standing outside of the truck was "peeing." Over appellant's objection on the grounds described above, Ruiz testified Cordell and appellant "rushed out" of the car. She testified she heard both Cordell and appellant say "give me your money." According to Ruiz, appellant had the shotgun at that time. Ruiz stated that when Cordell and appellant got back into the car, they had a cell phone and "a bag."

Ruiz testified she drove the four of them around some more and they eventually turned onto Etta Drive. At that point, Ruiz testified, the seating arrangement in her car had changed. Ruiz stated she and Ranisha were in the front, Cordell was sitting behind Ranisha, and appellant was sitting behind Ruiz.

Ruiz stated that on Etta, they passed a truck with "a guy and a girl" who looked "like kids." Ruiz stated the girl was sitting in the driver's seat of the truck with the door open and the boy was standing outside the driver's side of the vehicle. Ruiz testified she was told to turn around and drive past the truck again and she did so. She stated that when the front end of her car had "barely passed" the back of the truck, she was directed to stop and did so. Ruiz testified appellant stuck the gun out the window and said, "Give me your money." According to Ruiz, Cordell "had gotten out the car [sic] at some time when [appellant] had stuck that gun out that window." Ruiz testified appellant opened the car door and got out, but barely had room to stand. She stated that the boy standing outside the truck "looked like he was about to run." She testified she told the boy "[p]lease don't run." Then, Ruiz testified, "[t]he gun went off."

According to Ruiz, as soon as the gun went off, appellant "jumped in the car and said 'Go, go, go.'" Ruiz saw that Cordell was not in the car. She asked appellant, "Where is he?" Ruiz testified appellant told her, "He ran." Ruiz stated she looked toward the truck and the girl

in the truck said, "He shot him." Ruiz looked in the rearview mirror and saw Cordell lying on the ground. She got out of the car. According to Ruiz, before she could run to Cordell, appellant "had jumped into the front seat, like, climbed over from the backseat to the front seat and was trying to leave in my car." Ruiz testified she tried to pull appellant from the car. She stated appellant "got out the car, ran around the front, grabbed his girlfriend and they took off running in the opposite direction." She stated appellant was carrying the shotgun. Ruiz testified she stayed at the scene and called 911. She stated that she recognized the car in the photographs of the crime scene as her vehicle.

Ruiz stated she initially told the police lies that included (1) "[appellant] said he had a friend that lived on that street or that he could sell the gun to, so that's why we went over there" and (2) she had no knowledge that a robbery was planned. Ruiz testified she was charged with aggravated robbery for her role in the events in question. She stated she had made no deals with the State respecting her testimony.

On cross-examination, Ruiz testified she was currently in jail as a result of pending drug cases. Additionally, she stated she (1) had "expressed" to Cordell that she thought appellant was "bad news" and (2) told police she "didn't like" appellant.

Ranisha Evans testified appellant is the father of her ten-month-old daughter. Evans stated she was in a relationship with appellant from June 2009 until he went to jail in 2010. Evans testified that on the date in question, she went to Oak Cliff to see appellant and they spent the morning together "just chillin." She stated that sometime in the afternoon, she and appellant accompanied Ruiz to a car wash and washed Ruiz's car. Evans testified Ruiz drove her and appellant "back home" at approximately 6 p.m. According to Evans, she and appellant went to a block party, then "met up" with Cordell and Ruiz at about 11 p.m. Evans testified she had not met or seen Cordell or Ruiz prior to that day.

–7–

Evans stated she had no knowledge of any plan to commit aggravated robberies. She stated she thought the four of them were going to get something to eat. According to Evans, after "driving around," Ruiz pulled over. Evans testified Cordell "hopped out the car and went and got the gun from the trunk." Evans stated there was also another weapon in the car. She testified the other weapon was a hammer.

Evans testified they drove around some more, then stopped again. Over appellant's objection on the grounds described above, Evans testified appellant and Cordell got out of the car and robbed a man and woman in a truck stopped by the side of the road.

Evans testified that at the time they arrived on Etta, she was riding in the front passenger seat and Ruiz was driving. She stated Cordell was sitting behind Ruiz and appellant was sitting behind Evans. Evans stated Cordell opened the car door and she heard him say, "Give me all your money." Then, Evans testified, she heard a gunshot. She testified she was not sure who had the gun at that point. She stated she did not recall appellant lowering the window and pointing the gun out.

According to Evans, at the time she heard the gunshot, she did not know what was going on. She testified appellant told her "[g]o, go, go" and she ran with appellant because she was scared. She stated they ran for approximately thirty or forty minutes and ended up at an apartment complex in Pleasant Grove. Then, they used Evans's phone to call a cab.

Evans testified she was charged with aggravated robbery based on the events of the night in question and is currently out on bond. She stated she had "discussed getting probation" if she "testified honestly" in this case.

On cross-examination, Evans testified she initially told police that neither she nor appellant was involved in the events alleged in this case. She testified appellant told her to tell police the two of them were at a party at the time of the shooting and she did so.

Felder testified he grew up with Cordell and has known appellant for many years. He stated that at approximately 8 p.m. on the evening in question he was leaving the Grove Village apartments when he saw a car driven by Ruiz "coming into the apartments." He testified Evans was sitting next to Ruiz and appellant was in the back seat of the car. Felder stated Cordell was not with them. A photograph of a car was admitted into evidence and Felder identified that car as the one he had seen.

Felder stated he had a brief conversation with the three as he passed them. About an hour later, Felder returned to the same apartments. He testified he saw the three of them leaving in the same car and waved to them.

According to Felder, "some days" before the shooting in question, Felder had a communication with appellant about a pump shotgun appellant and Cordell were trying to sell. Felder stated, "They were sending texts and asking me did I know somebody who would want to buy it and I just left it alone." Felder testified that after Cordell was shot, Felder sent police a text message he had received from Cordell three days before the shooting that showed a photograph of the shotgun.

On cross-examination, Felder stated that the person holding the shotgun in the photograph he sent to police was not appellant. Additionally, Felder stated Cordell and appellant "both sent me a picture of the gun."

Marcos Garay testified that at approximately midnight on the night in question, he was at his home on Etta Drive. A birthday party for him was being held inside the house and in the backyard. Garay testified his friend Blanca pulled up in front of the house in her truck and he went outside to talk to her. He stated that while they talked, Blanca was sitting in the driver's seat of the truck with the driver's side door open. He stood in the street outside the driver's side door of her truck.

Garay testified he saw the same car pass by three times. Then, he heard someone behind him say, "Hey, give me your money." He testified he turned around and saw a shotgun pointed at his stomach. Garay stated the shotgun was being pointed at him by a male sitting behind the driver in the back seat of the car he had seen passing by. The window of the car was rolled down. According to Garay, at that point, "one of [the gunman's] friends, I'm guessing, ran around to the back of the car." Garay testified it looked to him like the gunman "got distracted." Then, Garay stated, he "saw the sparks come out of the gun" and saw the person who had run around the back of the car get shot with the shotgun.

A shotgun was admitted into evidence for demonstrative purposes and Garay stated it was "a lot like" the gun he saw. Garay stated four people had been in the car he saw: the male who pointed the shotgun at him, the male who was shot, a female who was driving, and a fourth person whom Garay could not identify as male or female. Garay stated he did not see the face of the male who pointed the shotgun at him because his focus "was all on the gun."

Garay testified that after the shooting, he saw one person running from the car. Garay ran into the house to ask for help. He stated he heard a woman from the car screaming outside. According to Garay, "not even three seconds later, the cops started showing up from every direction."

Over objection by appellant on the grounds described above, Gonzales, Martinez, and Randle testified to the same facts stated by them during the hearing outside the presence of the jury described above. Additionally, (1) the exhibits admitted for limited purposes at the hearing, including State's exhibits numbers 22 and 23 and a copy of the photographic lineup shown to Martinez, were admitted into evidence at trial and (2) a video recording of Martinez viewing the photographic lineup was admitted into evidence and portions were published for the jury. Further, Randle testified (1) photograph number two in the lineup shown to Martinez was a

photograph of appellant and (2) no case was filed respecting the robbery of Gonzales and Martinez because "[a]fter reviewing the case, talking with [Martinez], the witnesses and all, I felt like I didn't at this particular time have enough evidence to file this case with him not being 100 percent sure of the photograph we showed him in the lineup."

Kate Zimmer testified that at the time of the events in question, she was a detective with the Dallas Police Department. She stated that on April 16, 2010, she conducted a search of Ruiz's car at the "Dallas Police auto pound." Zimmer stated she photographed the interior and exterior of the vehicle and processed the vehicle for fingerprints and blood. According to Zimmer, the following items were found in the car: (1) a green and silver makeup bag, (2) a plastic glove, (3) some torn pieces of plastic gloves, (4) "a couple of cell phones and, like, chargers," (5) some "possible marijuana," (6) a fired shotgun shell, and (7) a counterfeit $100 bill. Photographs of the vehicle and the items found were admitted into evidence and described by Zimmer. Zimmer testified State's exhibits numbers 22 and 23 were photographs of a makeup bag and cell phone that were found by her in Ruiz's car.

Additionally, Zimmer was asked by the State, "Do you have any opinion based on your training and experience on why people are—a person would have a counterfeit [sic] money in their car or with them?" Counsel for appellant objected and stated, "I think that's speculation and certainly irrelevant. They're trying to bring up an extraneous offense, it sounds like." The trial court overruled appellant's objection. Then, Zimmer stated, "Well, I guess there could be several reasons why somebody had a counterfeit $100 bill. Obviously, you might, you know, try and pass it as real money at some point."

Keith Pinckard testified he is a medical examiner at the Southwestern Institute of Forensic Sciences. He stated he oversaw the autopsy performed on Cordell's body on April 11, 2010. Pinckard testified the autopsy showed a shotgun entrance wound on the right side of the

head just behind the right ear. According to Pinckard, (1) a shotgun is a deadly weapon and (2) the cause of death in this case was a shotgun wound to the head. Additionally, Pinckard testified toxicology tests performed on Cordell's blood showed the presence of marijuana and methylene dioxyamphetamine, also known as MDMA or "ecstasy." The autopsy report and photographs from the autopsy were admitted into evidence.

After the State rested its case, counsel for appellant moved for a directed verdict outside the presence of the jury "on the specific charge of felony murder." Counsel for appellant argued in part

> The State has . . . zero connection outside of the two co-defendants that at the time of this offense—that my client, Mr. McDonald, was in possession of a firearm, that he had ever been in possession of that firearm, that he's the one that pulled the trigger on that firearm, or that he in any way committed an act clearly dangerous to human life, specifically shooting that firearm.
> I think at this point, the only way—the just thing to do, based on the evidence before the Court at this point, is require the State to elect to go forward only as an aggravated robbery . . . .

The trial court denied appellant's motion for a directed verdict.

Following the jury's return to the courtroom, Detective Chamberlain testified for the defense. Chamberlain stated he was one of the detectives that assisted in this case. He testified he was at the crime scene on Etta Drive on the night in question and interviewed several witnesses, including Felder. According to Chamberlain, Felder showed him a photograph Cordell had sent to Felder's cell phone. Chamberlain testified the photograph showed Ruiz holding a shotgun. A black and white copy of the photograph was admitted into evidence and identified by Chamberlain. Additionally, Chamberlain stated he spoke with Lakesha Taylor, a friend of Cordell's. Chamberlain testified Taylor stated to him that she (1) talked to Cordell a few hours before the shooting and (2) "heard" that Cordell was with "a guy from New Orleans" on the night in question. Further, Chamberlain stated Taylor "indicated" to him that the "guy

from New Orleans" was not appellant. Chamberlain testified he gave that information to the lead detective in the case.

During the charge conference, counsel for appellant requested outside of the jury's presence that the charge of the court include an instruction that "extraneous offenses have to be proven beyond a reasonable doubt." Counsel for appellant argued that requested instruction pertained to (1) the evidence the trial court had previously ruled "res gestae" and (2) the "implication . . . that our guy is responsible for the counterfeit money." The trial court denied that request and overruled appellant's subsequent objection to the lack of such instruction.

Additionally, defense counsel requested jury instructions on several lesser included offenses, including aggravated robbery. Defense counsel argued in part

> We're also asking for a lesser included of aggravated robbery to be included based on the fact that—the same one I made in the directed verdict portion. I believe that even though there may be evidence showing a connection between another robbery and this robbery, there's no evidence showing any corroboration on the act of dangerous to human life.
>
> I believe the jury—a reasonable jury can look at all the evidence and assume that our client could potentially be guilty of aggravated robbery and not be guilty of an act clearly dangerous and that would make this a first degree aggravated robbery as opposed to a felony murder. We would ask you to include lesser included on that charge.

The trial court denied appellant's request for instructions on lesser included offenses.

During closing argument before the jury, counsel for appellant argued in part (1) both Ruiz and Evans are "accomplices by law"; (2) "[i]n order to convict when all you have is accomplice testimony, you have to remove the accomplice testimony" and "look at what's left . . . that tends to show this individual is connected to the offense"; (3) appellant "never possessed a weapon"; (4) other than accomplices, "[n]o one puts the rifle in [appellant's] hands" or "put[s] him at that house on Etta"; and (5) "[t]here is zero corroboration" as to the charged offense.

The State argued in part that the two questions the jury must answer are (1) whether they believe Ruiz and Evans and (2) whether there is any evidence to "corroborate" the testimony of

Ruiz and Evans. According to the State, evidence that "tends to connect" appellant to the charged offense included (1) Felder's testimony that he saw appellant with Evans and Ruiz hours before the shooting in the car used in both robberies, (2) Felder's testimony that he received texts from and had conversations about a shotgun with both appellant and Cordell, (3) testimony of Zimmer and Gonzales respecting a makeup bag taken from Gonzales that was later recovered in Ruiz's car, and (4) Martinez's testimony that he recognized appellant as the person who pointed a gun at him. The State asserted in part, "The big picture is, they went straight from one aggravated robbery to another, and the testimony from Ruben [Martinez] and Mary Lou [Gonzales] back that up and they help you understand and know that that's the truth and that's what happened."

The application paragraph of the charge of the court stated

> Now, if you find from the evidence beyond a reasonable doubt that on or about April 11, 2010, in Dallas County, Texas, the defendant, Neiman Laquinta McDonald, did intentionally or knowingly commit or attempt to commit the felony offense of aggravated robbery and, while in the course of or in furtherance of the commission of or attempt to commit the felony offense, or in the immediate flight from the felony offense, did then and there commit an act clearly dangerous to human life, to-wit: discharge a firearm at and in the direction of Kendrick Cardell, and did thereby cause the death of an individual, Kendrick Cardell, then you will find the defendant guilty of felony murder. [3]

---

[3] Additionally, the charge of the court that preceded the application paragraph stated in part

Our law provides that a person commits the offense of felony murder if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Our law provides that a person commits the felony of robbery if, in the course of committing theft, and with intent to obtain and maintain control of property of another, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

The offense is aggravated robbery if the person committing robbery uses or exhibits a deadly weapon. . . .
. . . .
You are instructed that an accomplice as the term is here used, means anyone connected with the crime charged, as a party thereto . . . . A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or both. . . .

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, or aids or attempts to aid the other person to commit the offense. . . .
. . . . .
Now, if you believe from the evidence beyond a reasonable doubt that an offense was committed, and you further believe from the evidence that the witnesses, Bonnie Ruiz or Ranisha Evans, are accomplices, or you have a reasonable

–14–

Following the jury's finding of guilt and assessment of punishment as described above, appellant filed a timely motion for new trial. That motion was overruled by the trial court. In the judgment in this case, the trial court ordered, in part, that appellant pay $464 in court costs. This appeal timely followed.

## II. ERROR DURING TRIAL

### A. Standards of Review and Applicable Law

#### 1. Evidence of Extraneous Acts

We review the admissibility of evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion and the trial court's ruling will be upheld. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Further, "if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed" regardless of the reason for the trial court's ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Generally, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. TEX. R. EVID. 404(b); *see Devoe*, 354 S.W.3d at 469. However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Devoe*, 354 S.W.3d at 469 (citing *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003)). For example, it may be admissible to show proof

---

doubt whether they were or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of either of the witnesses alone unless you first believe that their testimony is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant unless you further believe that there is other evidence in the case, outside of the evidence of either of the co-defendants tending to connect the defendant with the commission of the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty. . . .

of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. Additionally, evidence of another crime, wrong, or act may be admissible as same transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . . of any one of them cannot be given without showing the others." *Id*. (quoting *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)); *see also Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972) (using term "res gestae" to describe same transaction contextual evidence). The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Devoe*, 354 S.W.3d at 469. However, same transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence and it is admissible "only to the extent that it is necessary to the jury's understanding of the offense." *Id*. (quoting *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996)); *see also Delgado v. State*, 235 S.W.3d 244, 253 (Tex. Crim. App. 2007); *Prible v. State*, 175 S.W.3d 724, 731–32 (Tex. Crim. App. 2005). The erroneous admission of an extraneous offense is nonconstitutional error. *See Johnson v. State*, 84 S.W.3d 726, 729 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

### 2. Nonconstitutional Error

Under rule 44.2(b) of the Texas Rules of Appellate Procedure, nonconstitutional error must be disregarded unless the reviewing court finds it affected the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). In conducting the harm analysis, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's

consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even voir dire if material to the appellant's claim. *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). In assessing harm, the factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867.

### 3. Jury Charge Error

Appellate review of purported jury charge error involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *see also* TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006). First, we determine whether the charge is erroneous. *Kirsch*, 357 S.W.3d at 649; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If charge error exists, we analyze the error for harm. *Kirsch*, 357 S.W.3d at 649; *Ngo*, 175 S.W.3d at 743.

In analyzing harm, we consider (1) the entire charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Vasquez v. State*, 389 S.W.3d 361, 368–69 (Tex. Crim. App. 2012) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). The appellant must have suffered actual, rather than theoretical, harm. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). Neither the State nor the defense has a burden to prove harm. *See, e.g., Warner*, 245 S.W.3d at 464.

The degree of harm necessary for reversal depends on whether error was preserved. *Kirsch*, 357 S.W.3d at 649; *Ngo*, 175 S.W.3d at 743. If the defendant properly objected to an

erroneous jury charge, reversal is required if the error "is calculated to injure the rights of the defendant," which has been defined to mean that there is "some harm." *Barrios*, 283 S.W.3d at 350 (quoting *Almanza*, 686 S.W.2d at 171). If the error was not objected to, it requires reversal only if it was "fundamental" and the defendant suffered "egregious harm." *Reeves v. State*, No. PD-1711-12, 2013 WL 5221142, at *2 (Tex. Crim. App. Sept. 18, 2013); *Barrios*, 283 S.W.3d at 350. Jury charge error is egregiously harmful if it affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). Egregious harm is a difficult standard and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *see Reeves*, 2013 WL 5221142 at *2 (egregious harm is "high and difficult standard which must be borne out by the trial record").

The purpose of the trial court's jury charge is to instruct the jurors on all of the law applicable to the case. *Vasquez*, 389 S.W.3d at 366; *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (providing in part that trial court shall deliver to jury "a written charge distinctly setting forth the law applicable to the case"). "'Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense.'" *Vasquez*, 389 S.W.3d at 366 (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). "The jury charge may not enlarge the offense alleged and authorize the jury to convict a defendant on a basis or theory permitted by the jury charge but not alleged in the indictment." *Head v. State*, 299 S.W.3d 414, 439 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Reed v. State*, 117 S.W.3d 260, 265 (Tex. Crim. App. 2003)).

Upon request, a trial court should instruct a jury that they are not to consider evidence of an extraneous act unless they believe beyond a reasonable doubt that the defendant committed

the act. *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001); *see also Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) ("If a defendant, during the guilt/innocence phase, asks for an instruction to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction."). However, "admission of same transaction contextual evidence during the guilt-innocence phase does not require a reasonable doubt instruction." *Atkinson v. State*, 404 S.W.3d 567, 574 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

A trial court's decision not to submit a lesser included offense instruction is reviewed for abuse of discretion. *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005); *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). The determination of whether a lesser included offense instruction requested by a defendant was improperly refused requires a two-step analysis. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011) (citing *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007)). First, we determine whether the lesser included offense is included within the proof necessary to establish the offense charged. *Id.*; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006). Second, we determine whether there is some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of only the lesser included offense. *Rice*, 333 S.W.3d at 145 (citing *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006)).

The second step is a question of fact and is based on the evidence presented at trial. *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). The evidence must establish the lesser included offense as "a valid rational alternative to the charged offense." *Rice*, 333 S.W.3d at 145; *Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008). In making this determination, we review all of the evidence presented at trial. *Hayward v. State*, 158 S.W.3d 476, 478–79 (Tex. Crim. App. 2005). A defendant is entitled to an instruction on a lesser

–19–

included offense if some evidence from any source raises a fact issue on whether he is guilty of only the lesser, regardless of whether the evidence is weak, impeached, or contradicted. *Cavazos*, 382 S.W.3d at 383; *see Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011) (anything more than scintilla of evidence is sufficient to entitle defendant to lesser charge). However, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense." *Robinson v. State*, No. 05-10-00855-CR, 2011 WL 6034511, at *1 (Tex. App.— Dallas Dec. 5, 2011, pet. ref'd) (mem. op., not designated for publication) (citing *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003), *abrogated on other grounds by Grey v. State*, 298 S.W.3d 644 (Tex. Crim. App. 2009)). Instead, the record must contain evidence establishing that if the defendant is guilty, he is guilty only of the lesser offense. *Id*. (citing *Hall*, 225 S.W.3d at 536); *see also Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994) ("there must be some evidence directly germane to a lesser included offense for the factfinder to consider").

### 4. Elements of Offense

A person commits felony murder if he "[c]ommits or attempts to commit a felony, other than manslaughter, and in the course of or in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011). Additionally, under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id*. § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2).

*B. Analysis*

1. Application Paragraph Error

We begin with appellant's second issue, in which he contends the application paragraph of the jury charge "erroneously permitted conviction on a theory not alleged in the indictment." Specifically, appellant asserts (1) the indictment alleged in part that appellant "did unlawfully . . . commit and attempt to commit" the felony offense of aggravated robbery "and *while in the course of and in furtherance of the commission of and attempt to commit said offense*, did then and there commit an act clearly dangerous to human life" that caused Cordell's death and (2) the application paragraph of the jury charge authorized conviction if the jury found beyond a reasonable doubt that appellant "did intentionally or knowingly commit or attempt to commit the felony offense of aggravated robbery and, *while in the course of or in furtherance of the commission of or attempt to commit the felony offense, or in the immediate flight from the felony offense*, did then and there commit an act clearly dangerous to human life" that caused Cordell's death. (emphasis added). Further, according to appellant, "[b]ecause no objection was made at trial to this language in the application paragraph, the charge must be reviewed for egregious error."

The State asserts (1) although the jury charge in this case "erroneously expanded the scope of the indictment," appellant "did not lodge an objection to the court's charge on this ground" and therefore an egregious harm analysis is required and (2) appellant has not shown he was egregiously harmed.

We conclude the jury charge in this case erroneously authorized the jury to convict appellant on a basis or theory not alleged in the indictment. *See Reed*, 117 S.W.3d at 265; *Head*, 299 S.W.3d at 439. Further, because the record shows no objection by appellant to this error, the

–21–

"egregious harm" standard applies. *See Reeves*, 2013 WL 5221142, at *2; *Barrios*, 283 S.W.3d at 350.

Appellant contends "[t]he error in the case at bar is particularly egregious since there are facts from which a rational jury could have determined that Appellant was breaking off from a robbery at the time the gun discharged." According to appellant, the jury could have convicted him of felony murder based on a belief that he was in "immediate flight" from a robbery at the time of the shooting rather than on the theory charged in the indictment. In support of that contention, appellant cites Garay's testimony that, prior to Cordell being shot, the shotgun was pointed at Garay. Appellant argues

> In order for the gun to discharge and for a shotgun blast to hit Cordell, Appellant would, of necessity, have turned away from Garay. This could lead a jury to conclude that the robbery was being discontinued, hence putting Appellant in "immediate flight" from the robbery/attempted robbery.

Appellant does not cite any authority or additional evidence from the record in support of that argument.[4]

> The State argues in part
>
> The evidence unquestionably showed that Appellant was, at a minimum (according only to Ranisha Evans's testimony), a party to the aggravated robbery and felony murder. The testimony of Officer Lang, Marcus Garay, Bonnie Ruiz, Ranisha Evans, and various exhibits clearly established that the homicide occurred at the scene of the aggravated robbery, just inches or feet away from where the motionless aggravated-robbery victim Garay stood while he was threatened at gunpoint. According to the same testimony of Garay, Ruiz, and Evans, it must have been just mere seconds that transpired between the initiation of the aggravated robbery and the firing of the gun. Garay had not handed over any money or property before the gun was shot, nor had Appellant yet abandoned the aggravated robbery by fleeing in the car or on foot. Ultimately, the evidence conclusively demonstrated that the aggravated robbery had not yet terminated when the shooting occurred, and there was no physical flight of any sort before the shooting.

---

[4] Additionally, appellant asserts in his brief in this Court, "Coupled with the fact that the shooting of Cordell was not an intentional act, a rational jury could have concluded that the shooting was totally unrelated to the robbery. *See* Point of Error 1, *supra*." However, appellant does not explain, and the record does not show, how any mental state respecting the shooting in question is material to this issue. *See* TEX. R. APP. P. 38.1(i).

(footnote citations omitted).

As described above, in conducting a harm analysis, we consider (1) the entire charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Vasquez*, 389 S.W.3d at 368–69; *see also Sanchez*, 376 S.W.3d at 775 (appellant must have suffered actual, rather than theoretical, harm). Jury charge error is egregiously harmful if it affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Allen*, 253 S.W.3d at 264; *Stuhler*, 218 S.W.3d at 719.

As to the entire charge, the jury in this case was instructed that appellant could be convicted based on his own conduct or that of a party. *See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a)(2). Therefore, our analysis is not confined only to appellant's conduct. *Id*. Further, as described above, the phrase "immediate flight" appears twice in the charge, in the definition of the offense of felony murder and in the application paragraph. In each instance, the phrase appears in a sentence that also contains the theory alleged in the indictment. *See Frost v. State*, 25 S.W.3d 395, 401 n.11 (Tex. App.—Austin 2000, no pet.) (distinguishing cases in which defendant was egregiously harmed because there was "no correctly submitted theory" in jury charge from cases in which "the jury is presented with two theories, only one of which is alleged in the indictment, and the appellate court determines that there is no egregious harm"). Next, as to the state of the evidence and contested issues, appellant does not assert, and the record does not show, that the evidence in this case is insufficient to support a conviction on the theory alleged in the indictment, i.e. that the shooting was committed "in the course of and in furtherance of the commission of and attempt to commit" aggravated robbery. *See Lang v. State*, 698 S.W.2d 223, 225 (Tex. App.—Dallas 1985, no pet.) (considering sufficiency of evidence in egregious harm analysis); *Hayes v. State*, 265 S.W.3d 673, 692–94 (Tex. App.—Houston [1st

–23–

Dist.] 2008, pet. ref'd) (same); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (sufficiency of evidence is determined by reviewing all evidence in light most favorable to verdict to determine whether any rational trier of fact could have found essential elements of offense beyond a reasonable doubt). While a charge authorizing conviction on a theory not alleged in the indictment is not necessarily free from egregious error merely because the evidence is sufficient to support the allegations of the indictment, such factor weighs against a conclusion of egregious harm. *See Lang*, 698 S.W.2d at 225; *Hayes*, 265 S.W.3d at 692–94. Further, appellant does not explain, and the record does not show, how (1) appellant "would, of necessity, have turned away from Garay" in order for "a shotgun blast" to hit Cordell or (2) how appellant's "turn[ing] away" from Garay would constitute evidence "that the robbery was being discontinued." We disagree with appellant that there is evidence in the record from which a rational jury could find that "the robbery was being discontinued" and "immediate flight" was occurring at the time of the shooting in question. *See Bonfanti v. State*, 686 S.W.2d 149, 152–53 (Tex. Crim. App. 1985) (considering whether any evidence supported theory erroneously added to jury charge in conducting egregious harm analysis). Finally, the record shows that the issue of whether "immediate flight" was occurring at the time of the shooting in question was not argued to the jury by either side.

On this record, we conclude appellant was not egregiously harmed by the complained of error respecting the application paragraph of the jury charge. *See Bonfanti*, 686 S.W.2d at 152–53 (although jury charge allowed jury to convict appellant if they found either that he had "threatened death or serious bodily injury as alleged in the indictment" or had "caused" serious bodily injury, there was no egregious harm where record showed no evidence of actual serious bodily injury, such issue was not argued or presented to jury, and evidence of appellant's guilt as to indicted conduct was not in question); *Douglas v. State*, No. 03-98-00301-CR, 1999 WL

–24–

272904, at *4 (Tex. App.—Austin May 6, 1999, pet. ref'd) (not designated for publication) (no egregious harm where no evidence supported theory erroneously added to jury charge and rational jury could not have found such addition a reasonable theory on which to convict); *see also Lang*, 698 S.W.2d at 225 (no egregious harm where appellant could not plausibly argue defense was prejudicially misled by variance in jury charge because evidence at trial raised no issue respecting matter in complained of jury instructions); *Hayes*, 265 S.W.3d at 692–94 (egregious harm not shown where jury charge allowed conviction on additional theory not charged in indictment); *Fowler v. State*, 958 S.W.2d 853, 857–59 (Tex. App.—Waco 1997) (no egregious harm merely because charge allowed conviction on uncharged theory in addition to theory in indictment), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999); *Castillo v. State*, 944 S.W.2d 440, 441 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (egregious harm not shown where indictment charged robbery by threat, but jury was charged on both robbery by threat and robbery by bodily injury).

We decide against appellant on his second issue.

### 2. Lesser Included Offense of Aggravated Robbery

Next, we address appellant's first issue, in which he contends the trial court erred by not instructing the jury on the lesser included offense of aggravated robbery as requested by him. Appellant argues "[t]he lesser offense of aggravated robbery was established by the indictment and by the evidence." Appellant asserts this error resulted in "some harm" to him, "thereby entitling him to a new trial." The State responds that appellant was not entitled to the requested lesser included offense instruction because there is no evidence in the record from which a rational jury could acquit appellant of felony murder while convicting him of the underlying robbery.

As described above, a person commits felony murder if he "[c]ommits or attempts to commit a felony, other than manslaughter, and in the course of or in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(3). A person commits aggravated robbery if he, in the course of committing theft and with intent to obtain or maintain control of property, intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death and used or exhibited a deadly weapon. *Id*. §§ 29.03, 29.02. Further, as described above, the jury in this case was charged as to the law of parties. *Id*. §§ 7.01(a), 7.02(a)(2).

In the case before us, the State does not dispute that aggravated robbery is included within the proof necessary to establish the offense charged.[5] *See Rice*, 333 S.W.3d at 144; *cf. Littrell v. State*, 271 S.W.3d 273, 276 (Tex. Crim. App. 2008) (concluding aggravated robbery was lesser included offense of felony murder as alleged in indictment). Therefore, we examine whether some evidence would permit a rational jury to find appellant guilty of only aggravated robbery. *See Rice*, 333 S.W.3d at 145.

Appellant asserts in his brief in this Court that "Cordell was shot ancillary to an armed robbery in progress being committed by the quartet of Ruiz, Evans, Cordell and Appellant." However, appellant contends, the record contains "evidence which would support an inference that, if Appellant is guilty, he is guilty only of aggravated robbery and was not criminally culpable for Cordell's death." Appellant argues in part

> [T]he evidence in this case fails to reflect an intentional homicide or even that the shooting was the result of a knowing or reckless act. The jury could also have believed that the discharge of the gun was an accident and unrelated to the

[5] The State asserts in its brief in this Court, "Relative to the present case and the first condition, the State acknowledges that aggravated robbery is a lesser-included offense of the felony-murder charge."

robbery, while still believing that Appellant was committing or attempting to commit a robbery.

Appellant does not cite authority or the record in support of this argument.

The State asserts appellant's "mens rea consideration" is irrelevant because "there is no mens rea necessary for the 'act clearly dangerous to human life that causes the death of an individual.'" Additionally, the State argues

> In order for Appellant to have been entitled to an aggravated-robbery lesser-included instruction, there would have needed to be some evidence that (1) the complainant did not die from the gunshot, (2) Appellant or anyone in his party did not commit an act clearly dangerous to human life, or (3) that the act clearly dangerous to human life did not occur in the course of and in furtherance of the commission of the aggravated robbery. [6]

The State contends "there was no trial evidence to support any of these scenarios.

The record shows a shotgun was fired in the direction of Cordell in this case. "[F]iring a gun in the direction of an individual is an act clearly dangerous to human life." *Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999). Appellant does not explain, and the record does not show, how the issue of whether the shooting in question was "intentional," "knowing," "reckless," or "an accident" is material to the offense of felony murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(3); *see also Threadgill*, 146 S.W.3d at 665 ("[f]elony murder is an unintentional murder committed in the course of committing a felony"); *Hambrick v. State*, 369 S.W.3d 535, 539 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (appellant's accidental shooting of friend who was assisting him in committing aggravated assault constituted felony murder); c*f. Lomax v. State*, 233 S.W.3d 302, 307 n.16 (Tex. Crim. App. 2007) ("act clearly dangerous to human life" in Texas Penal Code section 19.02(b)(2) does not require culpable mental state). Further,

---

[6] The State asserts in its brief in this Court, "The 'immediate flight' prong [of section 19.02(b)(3) of the Texas Penal Code] was not alleged in the indictment, so it is also not considered here." As described above in our analysis of appellant's issue number two, the indictment in this case did not allege the "immediate flight" portion of section 19.02(b)(3). *See* TEX. PENAL CODE ANN. § 19.02(b)(3). Because our analysis respecting appellant's issue number one must focus on the "offense charged," *see Rice*, 333 S.W.3d at 145, we do not address the "immediate flight" portion of section 19.02(b)(3).

appellant cites no evidence in the record, and we find none, that the shooting did not occur "in the course of and in furtherance of the commission" of the aggravated robbery in question or that the shooting was "unrelated to the robbery."[7]

We disagree with appellant that the record contains "evidence which would support an inference that, if Appellant is guilty, he is guilty only of aggravated robbery and was not criminally culpable for Cordell's death." On this record, we conclude appellant was not entitled to a jury instruction on the lesser included offense of aggravated robbery and the trial court did not err by denying his request for such instruction. *See Rice*, 333 S.W.3d at 145.

We decide against appellant on his first issue.

### 3. Extraneous Offense Respecting Attempt to Sell Shotgun

In his third issue, appellant contends the trial court erred "by allowing extraneous offense testimony at the guilt/innocence phase of the trial that Appellant had been trying to sell a shotgun two or three days prior to the shooting." Specifically, appellant complains as to Felder's testimony respecting the attempted sale of a pump shotgun. Appellant asserts that testimony is not same transaction contextual evidence because "it was not close enough in time, did not provide an explanation of the shooting, and did not dispositively establish that Appellant had possession of the murder weapon."

The State responds that "the trial court was within its discretion in concluding that the testimony tended to show appellant's ownership of the distinctive pump shotgun just a few days before the murder (committed with a pump shotgun), thus by inference connecting him to the murder." According to the State, "[t]he fact that Appellant tried to sell the pump shotgun . . .

---

[7] To the extent appellant's argument can be construed to refer to the testimony of Garay cited by appellant in his argument pertaining to his second issue, we concluded above such testimony was not evidence that the robbery "was being discontinued" at the time of the shooting.

links him more strongly to the pump shotgun than mere possession would, as it implies purported ownership rather than incidental control." Additionally, the State asserts

> Ultimately, in order for the State to prove its felony-murder case, it had to show that Appellant was responsible, as an actor or party, for the homicide. This showing necessarily involved delving into the issue of the gun's ownership, possession, and control in the days leading up to the incident and during the incident itself. It was "fact information essential to understanding the context and circumstances of events."

The record shows counsel for appellant asserted in part during closing argument (1) appellant "never possessed a weapon" and (2) other than accomplices, "[n]o one puts the rifle in [appellant's] hands" or "put[s] him at that house on Etta." Thus, the issue of whether, several days prior to the shooting in question, appellant had ownership of a shotgun that matched the description of the gun used in the offense was a "relevant surrounding fact" and was necessary to the jury's understanding of the offense. *See Devoe*, 354 S.W.3d at 469; *see also Ransom v. State*, 920 S.W.2d 288, 300–01 (Tex. Crim. App. 1996) (op. on reh'g) (extraneous offense testimony that gun used as murder weapon was stolen by appellant "a month or two" before murder was admissible because such testimony "tended to show appellant's ownership of the [gun] before the murder, thus connecting him to the murder"). Felder testified in part that appellant and Cordell were trying to sell a pump shotgun "some days" before the shooting in question and "both sent me a picture of the gun." A copy of a photograph of that gun that was sent to Felder by Cordell in a text message was admitted into evidence. Further, Garay's testimony included a description of the shotgun he saw at the time of the shooting. On this record, we conclude the trial court did not abuse its discretion by concluding that Felder's testimony respecting the attempted sale of a pump shotgun was same transaction contextual evidence.[8] *See Devoe*, 354 S.W.3d at 469.

---

[8] Additionally, the State addresses the same testimony of Felder in the portion of its appellate brief pertaining to appellant's fifth issue. In that argument, the State asserts that, alternatively, "proof that Appellant was attempting to arm himself with a shotgun days prior to the offense

We decide appellant's third issue against him.

### 4. Evidence Pertaining to Counterfeit $100 Bill

In his fourth issue, appellant asserts "[t]he trial court erred by allowing extraneous offense testimony at the guilt/innocence phase of trial concerning a counterfeit $100 bill." Specifically, appellant complains of "[t]he evidence regarding the counterfeit bill and the potential reason why a person might have a counterfeit bill." According to appellant,

> [T]here is absolutely no evidence that the counterfeit bill, and the use to which it might be put, had anything to do with the offense for which Appellant was on trial. Hence, it was not "res gestae" of the offense. The only reason for the prosecutor's question was to show that Appellant and his cohorts were criminals generally. Furthermore, there is no evidence, much less evidence beyond a reasonable doubt, to demonstrate that it was Appellant who possessed the counterfeit bill. The bill was simply found in the vehicle belonging to one of the accomplices.

Additionally, appellant contends the error was not harmless because "[t]he testimony implied strongly that Appellant was a criminal generally, who possessed contraband and perhaps intended to try and negotiate the bill, thereby committing yet another extraneous offense."

The State asserts that appellant's counsel did not object when a photograph of the $100 bill was admitted into evidence "for all purposes" or when Zimmer described the bill as "counterfeit." According to the State, (1) the trial court did not err by admitting Zimmer's testimony about the counterfeit bill "because the fact that the counterfeit currency was found was already properly admitted—without an objection—as same transaction contextual evidence" and (2) "Zimmer's subsequent answer to the hypothetical question concerning the counterfeit currency was proper expert testimony." Further, the State contends any error respecting admission of the evidence in question was harmless because (1) "there was overwhelming

---

would show opportunity, intent, and preparation, and, therefore, be admissible pursuant to Texas Rule of Evidence 404(b)." *See* TEX. R. EVID. 404(b). Because we have concluded the trial court did not abuse its discretion by admitting Felder's testimony in question as same transaction contextual evidence, we need not reach the State's arguments respecting alternative theories of admissibility. *See* TEX. R. APP. P. 47.1.

evidence of Appellant's guilt" and (2) the State spent little time on the counterfeit currency during the presentation of its case and did not mention it in closing argument.

To the extent appellant complains on appeal as to the admission of the photograph of the $100 bill in question and Zimmer's testimony that it was counterfeit, appellant made no objection to that evidence at trial and therefore that complaint presents nothing for this Court's review. *See* TEX. R. APP. P. 33.1; *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). As to Zimmer's testimony that "somebody" who possesses counterfeit currency "might . . . try and pass it as real money at some point," the State does not explain, and the record does not show, how such testimony was same transaction contextual evidence. *See Devoe*, 354 S.W.3d at 469. Further, the State does not assert, and the record does not show, that such testimony falls under any other exception to the general inadmissibility of evidence of extraneous acts. *See id.*

Additionally, in support of its assertion that such testimony was "proper expert testimony," the State cites a case based on Texas Rule of Evidence 702. *See Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1997); *see also* TEX. R. EVID. 702. Rule 702 allows expert opinion testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. "[T]he testimony must reflect information outside the general knowledge of lay persons." *Schutz*, 957 S.W.2d at 70; *see Franco v. State*, 25 S.W.3d 26, 29 (Tex. App.—El Paso 2000, pet. ref'd) (same). However, the State does not explain, and the record does not show, how Zimmer's testimony as to what a person "might" attempt to do with counterfeit money satisfies those requirements. On this record, we conclude the trial court abused its discretion by admitting into evidence Zimmer's testimony respecting potential uses for counterfeit money.

Because this error was nonconstitutional, our harm analysis must focus on whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See*

–31–

TEX. R. APP. P. 44.2(b); *Barshaw*, 342 S.W.3d at 93–94; *Coble*, 330 S.W.3d at 280; *see also Johnson*, 84 S.W.3d at 729. In conducting this harm analysis, we consider everything in the record, including the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867.

The record shows (1) a photograph of the $100 bill in question and Zimmer's testimony that it was found in Ruiz's car and was counterfeit were admitted into evidence without objection; (2) the car in which the counterfeit bill was found did not belong to appellant; (3) appellant had been accompanied by others while riding in the car; (4) Zimmer's testimony in question did not refer to appellant specifically and was hypothetical; (5) the State did not mention the counterfeit bill or Zimmer's testimony about potential uses of counterfeit currency during closing argument; and (6) there was abundant evidence that appellant committed, or was a party to committing, the charged offense of felony murder involving the use of a firearm and an aggravated robbery involving the use of a firearm. Based on a review of the entire record, we conclude the error in question did not have a substantial and injurious effect or influence in determining the jury's verdict and therefore did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b).

We decide against appellant on his fourth issue.

5. Jury Instruction Respecting Burden of Proof as to Extraneous Offenses

In his fifth issue, appellant contends the trial court erred by not instructing the jury on "the proper standard of proof for extraneous offenses." Specifically, appellant's contention pertains to (1) Felder's testimony that appellant had been trying to sell a shotgun prior to the shooting in question, (2) evidence that appellant "had committed a robbery at gunpoint with Cordell on the same night as Cordell was shot," and (3) Zimmer's testimony respecting "the

–32–

potential use for a counterfeit bill." Appellant asserts the jury should have been instructed that they were not to consider those "extraneous acts" as evidence "unless they believe beyond a reasonable doubt that the defendant committed that act." Further, appellant argues the trial court's denial of a "reasonable doubt" instruction resulted in "some harm" to him because "[t]he absence of a charge on the standard of proof required left the jury with the impression that the evidence of the extraneous offenses could be considered for all purposes without a threshold finding that Appellant committed these offenses beyond a reasonable doubt" and "[t]hese extraneous offenses . . . served to paint a portrait of Appellant as a criminal generally, despite a lack of proof beyond a reasonable doubt that Appellant had committed any of these extraneous offenses."

The State responds in part that the evidence respecting appellant's attempt to sell a shotgun and his participation in an additional aggravated robbery constituted "same transaction contextual evidence." Thus, the State argues, a "reasonable doubt" instruction was not required. Additionally, according to the State, "[t]here was no extraneous offense, bad act, or wrong elicited from Detective Zimmer that was objected to by Appellant's trial counsel." Therefore, the State asserts, "an instruction was not required." Finally, the State argues any error in not providing the jury instruction in question "did not influence the jury or had but a slight effect and did not affect any substantial right."

We address the three "extraneous acts" described by appellant in turn. First, we concluded above that Felder's testimony respecting appellant's attempt to sell a shotgun prior to the shooting in question was same transaction contextual evidence. Therefore, no reasonable doubt instruction was required as to that evidence. *See Atkinson*, 404 S.W.3d at 574.

Second, appellant contends he "does not concede" that the robbery of Martinez and Gonzales was same transaction contextual evidence. However, appellant provides no argument

–33–

or authority in support of that position. The State asserts "[i]t is impossible to tell the story of how Appellant, complainant, [Ruiz], and [Evans] came together, what they were doing, and what their intentions were on the night of the felony-murder incident without including their first aggravated robbery that night." Further, according to the State, the group's "several consecutive crimes that night" constituted "an indivisible criminal transaction." The record shows the robbery of Martinez and Gonzales was committed on the same night as and in a manner similar to the robbery of Garay, by a group of individuals matching the same description. On this record, we conclude the evidence of the robbery of Martinez and Gonzalez was same transaction contextual evidence. *See Devoe*, 354 S.W.3d at 469–70 (evidence of uncharged crimes and incidents that occurred throughout appellant's "crime spree" that resulted in deaths of six individuals was admissible as same transaction contextual evidence in trial respecting murder of two of those individuals); *Sparks v. State*, 935 S.W.2d 462, 466 (Tex. App.—Tyler 1996, no pet.) (in appellant's trial for theft of vehicle, evidence involving theft of second vehicle during "crime spree" on same night in question was admissible as same transaction contextual evidence); *Head v. State*, No. 03-10-00414-CR, 2013 WL 1831576, at *5 (Tex. App.—Austin Apr. 24, 2013, no pet.) (mem. op., not designated for publication) (witness's testimony that he observed appellant in possession of firearm on same night and around same time as charged offense of aggravated robbery involving a firearm constituted same transaction contextual evidence). Accordingly, that evidence required no reasonable doubt instruction. *See Atkinson*, 404 S.W.3d at 574.

Third, we consider the following complained of testimony of Zimmer: "Well, I guess there could be several reasons why somebody had a counterfeit $100 bill. Obviously, you might, you know, try and pass it as real money at some point." We concluded above that such testimony was not same transaction contextual evidence. Additionally, an attempt to use counterfeit currency as "real money" is unlawful. *See, e.g.,* TEX. PENAL CODE ANN. § 32.21

(West 2011). Therefore, we disagree with the State's assertion that "[t]here was no extraneous offense, bad act, or wrong elicited from Detective Zimmer that was objected to by Appellant's trial counsel." Because the record shows appellant requested a "reasonable doubt" jury instruction as that "extraneous offense," he was entitled to that instruction and the trial court erred by denying that request. *See Ex parte Varelas*, 45 S.W.3d at 631; *Mitchell*, 931 S.W.2d at 954.

Further, because appellant objected to the erroneous jury charge, reversal is required if that error was "calculated to injure the rights" of appellant, which has been defined to mean that there was "some harm" to him. *See Almanza*, 686 S.W.2d at 171; *Barrios*, 283 S.W.3d at 350. As described above, in analyzing harm, we consider (1) the entire charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *See Vasquez*, 389 S.W.3d at 368–69; *see also Sanchez*, 376 S.W.3d at 775 (appellant must have suffered actual, rather than theoretical, harm).

The record shows (1) the jury charge contained definitions and instructions pertaining to the offense charged in the indictment, i.e., felony murder, and (2) the jury was instructed that if they did not find the elements of that offense beyond a reasonable doubt, appellant must be acquitted. Further, the record shows (1) Zimmer's testimony in question did not refer to appellant specifically and was hypothetical; (2) the State did not mention the counterfeit bill or Zimmer's testimony about potential uses of counterfeit currency during closing argument; and (3) there was abundant evidence that appellant committed, or was a party to committing, the charged offense of felony murder involving the use of a firearm and an aggravated robbery involving the use of a firearm. On this record, we cannot conclude the error in question was "calculated to injure the rights" of appellant. *See Almanza*, 686 S.W.2d at 171; *Barrios*, 283

S.W.3d at 350; *cf. Allen v. State*, No. 08–07–00326–CR, 2010 WL 2620587, at *10 (Tex. App.—El Paso June 30, 2010, no pet.) (not designated for publication) (concluding trial court's denial of requested jury instruction stating that extraneous offenses must be proved beyond a reasonable doubt did not result in "some harm" to appellant). Therefore, we conclude the error was harmless. *See Almanza*, 686 S.W.2d at 171; *Barrios*, 283 S.W.3d at 350.

Appellant's fifth issue is decided against him.

## III. ERROR RESPECTING COURT COSTS

In his sixth issue, appellant contends there is insufficient evidence in the record to support the portion of the trial court's judgment requiring appellant to pay $464 in court costs because the clerk's record does not contain a bill of costs. If a criminal action is appealed, "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is . . . appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006). Costs may not be collected from the person charged with the costs until a written bill, containing the items of cost, is produced and signed by the officer who charged the cost or the officer entitled to receive payment for the cost. *Id*. art. 103.001.

The clerk's record in this case did not contain a copy of the bill of costs and appellant's designation of record on appeal did not request that a copy of the bill of costs be included. In light of this and appellant's specific complaint that the clerk's record did not contain a bill of costs, we ordered the Dallas County District Clerk to file a supplemental record containing the certified bill of costs associated with this case, and the clerk did so. *See* TEX. R. APP. P. 34.5(c)(1) (rules of appellate procedure allow supplementation of clerk's record if relevant item has been omitted); *see also Coronel v. State*, No. 05-12-00493-CR, 2013 WL 3874446, at *4

(Tex. App.—Dallas July 29, 2013, no pet.); *Franklin v. State*, 402 S.W.3d 894, 895 (Tex. App.—Dallas 2013, no pet.).

In response to this Court's order requiring supplementation of the record, appellant filed an objection in which he argues (1) the bill of costs in the supplemental clerk's record is not a "proper bill of costs" and (2) the bill of costs was not filed in the trial court or brought to the trial court's attention before costs were entered in the judgment. For the reasons outlined below, we reject both arguments.

With respect to his first argument, appellant asserts the bill of costs in the supplemental clerk's record is not a "proper bill of costs" because "[a]ll that has been tendered in the supplemental clerk's record are unsigned, unsworn computer printouts." Appellant acknowledges the district clerk has certified that the "documents constitute costs that have accrued to date." However, appellant contends this does not "set out the costs as required by statute." While the code of criminal procedure requires a record to be kept, the code is silent on the form of such a record except to the extent it must be certified and signed "by the officer who charged the costs or the officer who is entitled to receive payment for the cost," "stating the costs that have accrued" if the cause is appealed. *See* TEX. CODE CRIM. PROC. ANN. art. 103.001, 103.006. Here, the district clerk provided a "Bill of Costs Certification" containing the costs that have accrued to date in appellant's case. It is certified and signed by the district clerk. Because it meets the mandate of the code of criminal procedure, we conclude appellant's objection that the bill of costs is not "proper" lacks merit. *See Coronel*, 2013 WL 3874446, at *4.

With respect to appellant's second complaint that there is no indication the bill of costs was filed in the trial court or brought to the trial court's attention before costs were entered in the judgment, nothing in the code of criminal procedure or the statutes addressing the assessment of costs against defendants requires that a bill of costs be presented to the trial court at any time

–37–

before judgment. *See id.* at *5. "[C]ourt costs are mandated by statute; they are not discretionary and, therefore, are not subject to approval or authorization by the trial court." *Id*. "Likewise, the code does not require the bill of costs be filed at the time the trial court signs the judgment of conviction." *Id*. The code only requires a bill of costs be produced if a criminal case is appealed or costs are collected. *Id*. Because there is no requirement that the costs be presented to the trial court, we conclude appellant's second argument respecting the supplemented record lacks merit. *See id*. We overrule appellant's objection to the supplemented record.

Appellant's complaint that the evidence is insufficient to support the imposition of costs because the clerk's record did not contain a bill of costs is now moot. *See id.* at *4–5. We decide appellant's sixth issue against him. [9]

## IV. CONCLUSION

We decide against appellant on his six issues. Additionally, appellant's objection to the supplemented record is overruled. We affirm the trial court's judgment.

/s/ Douglas Lang
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
120521F.U05

---

[9] We note that in appellant's original brief in this Court and his post-submission objection to the bill of costs, appellant does not challenge the propriety or legality of the specific costs assessed. *See id*. Therefore, we do not address those issues. *Id*.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NEIMAN LAQUINTA MCDONALD, Appellant

No. 05-12-00521-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 7, Dallas County, Texas
Trial Court Cause No. F10-54350-Y.
Opinion delivered by Justice Lang. Justices Moseley and Richter participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 23rd day of October, 2013.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE